Kathryn Grace RAMPY,
Plaintiff/Appellant,

v.

ICI ACRYLICS, INC., Bailey Hurley, Ted Warf, Beverly Martin, and Linda Elmore, Defendants/Appellees.

Court of Appeals of Tennessee,
Western Section at Jackson.

Oct. 24, 1994.

Application for Permission to Appeal Denied by Supreme Court April 3, 1995.

Larry E. Parrish, Memphis, for plaintiff/appellant.

Cary Schwimmer and John Marshall Jones, Young & Perl, P.C., Memphis, for all defendants/appellees except for Linda Elmore.

TOMLIN, Presiding Judge, Western Section.

Kathryn Grace Rampy ("plaintiff") filed suit in the Chancery Court of Shelby County against ICI Acrylics, Inc., Bailey Hurley, Ted Warf, Beverly Martin and Linda Elmore [1] (collectively, as "defendants" or by individual name), seeking damages for alleged wrongful termination, breach of an at will employment contract, breach of an alleged duty of loyalty and/or fair play, promissory estoppel, negligent supervision, civil conspiracy and vicarious liability for civil conspiracy. Pursuant to T.R.C.P. 12.02(6), all defendants filed motions to dismiss the complaint for failure to state a claim for which relief can be granted. Following a hearing, the chancellor dismissed plaintiff's complaint with prejudice as to all counts.

On appeal, plaintiff has presented four issues to this court for review: whether the trial court erred, in accordance with applicable Mississippi law, (1) in dismissing plaintiff's complaint with prejudice; (2) in dismissing all asserted and unasserted claims, by whatever nomenclature, other than her claim for wrongful termination; (3) in dismissing plaintiff's claim for wrongful termination of employment; and (4) in finding that defendants had not waived their right to assert as a defense the lack of *in personam* jurisdiction.

For the reasons hereafter set forth, we find no error and affirm the decree of the chancellor. Because the first three issues taken as a whole contend that the trial court

---

**1.** Defendant, Linda Elmore never made an appearance. Plaintiff subsequently took a voluntary nonsuit in regard to all claims against Elmore.

erred in granting defendants' T.R.C.P. 12.02(6) motion to dismiss with prejudice, we will discuss those issues as one. As our disposition of this issue is dispositive of this appeal, we pretermit plaintiff's fourth issue.

 Under our rules of civil procedure, a motion to dismiss for failure to state a claim upon which relief can be granted tests the sufficiency of the pleading setting forth the party's cause of action[2]. No argument in support of, or against, the complaint can add or detract from it. Plaintiff's complaint "must stand or fall upon its allegations unaffected by the approbation of its author or denunciations of the defense, as expressed in oral argument." *Cornpropst v. Sloan,* 528 S.W.2d 188, 190 (Tenn.1975). A 12.02(6) motion admits the truth of all relevant and material allegations contained in the complaint, but asserts that such facts do not state a cause of action for which relief can be granted. *Id.* at 190.

 A dismissal under T.R.C.P. 12.02(6) is warranted only where no set of facts contained in the pleading will entitle plaintiff to relief. *Dobbs v. Guenther,* 846 S.W.2d 270, 273 (Tenn.App.1992). It is inappropriate for the court to create a claim where none exists. *Id.* at 273. The trial court, as well as this court, must take all well-pleaded, material factual allegations as true, construing the complaint liberally in favor of plaintiff. *Lewis v. Allen,* 698 S.W.2d 58, 59 (Tenn.1985).

The relevant portions of plaintiff's lengthy complaint read as follows:

17. ICI, from products manufactured at the Olive Branch Plant, has annual sales of approximately $36 million.

18. On or about March 23, 1989, Rampy, in response to a blind want ad in The Memphis Commercial Appeal newspaper, inquired about a job opportunity.

19. In response to the aforesaid (¶ 18) inquiry, Rampy was contacted by ICI executives and asked to submit to a job interview process.

20. On request of ICI executives, as aforesaid (¶ 19), Rampy submitted to a job interview process with ICI executives.

21. Through a series of interviews by many separate ICI executives, including, primarily, the ICI executive most directly responsible, from ICI Headquarters, for oversight of the Olive Branch Plaint, Ron McCoy (hereinafter "McCoy"), and the plant manager of the Olive Branch Plant, Marinus Vader (hereinafter "Vader"), and interchange occurred between Rampy and ICI preliminary to Rampy agreeing to accept employment with ICI.

22. At the time Rampy was engaged in the interview process with ICI, as aforesaid (¶ 20, ¶ 21), Rampy was being interviewed by other prospective employers and in order to accept employment with ICI, it was necessary for Rampy to cut off further negotiations with other prospective employers.

23. Before Rampy agreed to accept the offer of employment by ICI, ICI described, in detail, the job responsibilities which Rampy would be expected to perform, including, but not limited to, plans for significant and material changes in systems and operation philosophy at the Olive Branch Plant which Rampy would be expected to implement.

24. Before Rampy agreed to accept the offer of employment by ICI, ICI described that, as the person in charge of devising and executing methodologies to implement the aforesaid (¶ 23) significant and material changes, Rampy should expect to encounter resistance from Olive Branch Plaint employees and be prepared to make un-

---

**2.** At the time of filing her complaint, plaintiff also filed a 392 page affidavit. Plaintiff cites *Coleman v. Chevron Pascagoula Federal Credit Union,* 616 So.2d 310 (Miss.1993) in support of her argument that the affidavit should be considered because "any set of facts" susceptible to being proven should be taken into consideration in deciding whether to grant the T.R.C.P. 12.02(6) motion to dismiss. First, Tennessee law, not Mississippi law, governs matters of pro-

cedure under our conflict of law principles. Furthermore, a motion to dismiss pursuant to T.R.C.P. is an examination of whether the complaint *alone* states a cause of action for which relief may be granted. *Wolcotts Financial Servs. v. McReynolds,* 807 S.W.2d 708, 710 (Tenn.App. 1990); *see also Cornpropst v. Sloan,* 528 S.W.2d 188 (Tenn.1975). We therefore, consider only the sufficiency of plaintiff's complaint.

popular personnel and systems changes as required.

25. The aforesaid (¶ 23) significant and material changes were provided to Rampy in written form in June 1989, the month after Rampy agreed to accept the offer of employment by ICI.

26. A true and exact copy of the aforesaid (¶ 25) writing provided, to Rampy in June 1989 is attached as Exhibit A hereto.

27. Before agreeing to accept the offer of employment by ICI, Rampy was told by ICI that the aforesaid (¶ 26) significant and material changes, were necessitated by the fact that the Olive Branch Plant, shortly theretofore, had been acquired as a going concern by ICI, with employees of the acquired company remaining in place and, the operation thereof had to be conformed to the operational philosophies of ICI.

28. Before agreeing to accept the offer of employment by ICI, Rampy was told that, if Rampy accepted an offer of employment by ICI, Rampy would become responsible for employees who had been accustomed, throughout their tenure as employees of the acquired company, to systems, philosophies and procedures of operation significantly and materially different from those which ICI would expect Rampy to implement.

29. The company acquired by ICI, as aforesaid (¶ 27), had been in continuous operation for approximately forty years.

30. Before Rampy agreed to accept the offer of employment by ICI, Rampy was told by ICI that many of the supervisory and other personnel who would be involved in the aforesaid (¶ 23, ¶ 26) significant and material changes to be implemented by Rampy had been relatively long-term employees, some with decades of tenure, with the acquired company and to whom the aforesaid (¶ 23, ¶ 26) significant and material changes might appear threatening.

31. Before Rampy agreed to accept the offer of employment by ICI, Rampy was told by ICI that Rampy would be the only employee, among approximately one hundred and ten other employees, of ICI assigned to the Olive Branch Plant who had not previously been employed at the Olive Branch Plant by the company acquired by ICI as aforestated (¶ 27, ¶ 28, ¶ 29, ¶ 30).

32. Before agreeing to accept the offer of employment by ICI, Rampy was told by ICI that, if Rampy accepted employment, Rampy would be directly answerable to no person at the Olive Branch Plant other than the plant manager (¶ 21 above), who was directly answerable to the ICI Headquarters executives (¶ 21) with oversight over the Olive Branch Plant and, in addition to having direct responsibility for the Olive Branch Plant accountant, the Olive Branch Plant purchasing manager, the Olive Branch safety coordinator, the Olive Branch Plant production scheduling coordinator, the Olive Branch Plant payroll administrator and the Olive Branch Plant receptionist/secretary, Rampy would be responsible for implementation of personnel functions and systems, through other Olive Branch Plant management and supervisory staff, on a plant-wide basis.

33. Before Rampy agreed to accept the offer of employment by ICI, Rampy was told by ICI that she would be the first-ever female to assume a management role at the Olive Branch Plant, either before or after acquisition of the Olive Branch Plant from its former owner, involved in managing personnel.

34. Rampy speaks with a notable accent indicating that Rampy has not been reared in the southern part of the United States.

35. When Rampy accepted the offer of employment by ICI, all of the ICI employees assigned to the Olive Branch Plant who held management or supervisory positions, except two other male employees, were native to the South and, with rare exception, most employees at the Olive Branch Plant were reared in the surrounding geographical area.

36. Having been induced so to do by the implicit promise of ICI to support and authoritatively stand behind Rampy, so long as Rampy performed her assigned job responsibilities competently and remained loyal to ICI, in the face of whatever resistance manifested itself from ICI employees, attributable to the faithful job perfor-

mance of Rampy, Rampy agreed, on May 17, 1989, to accept employment offered to Rampy by ICI and to assume a position as a member of the management staff at the Olive Branch Plant in charge of personnel and all other aspects of office management.

37. For so long as McCoy (¶ 21) and Vader (¶ 21) remained in positions of authority over Rampy at ICI, ICI remained faithful to the aforesaid (¶ 36) promise of ICI.

38. In October 1991, McCoy was reassigned by ICI to a special assignment for worldwide engineering.

39. In March 1992, McCoy was promoted to Director of Safety, Health and Environment at ICI Americas in Wilmington, Delaware and, thereafter, was no longer in the line of authority over Rampy.

40. In March, 1991, Vader was reassigned by ICI from the position of plant manager at the Olive Branch Plant to the position of Director of Safety and Quality at ICI Headquarters and, thereafter, was no longer in the line of authority over Rampy.

41. McCoy and Vader were replaced by person who had not been involved in the aforesaid (¶ 19, ¶ 20, ¶ 21, ¶ 23, ¶ 24, ¶ 27, ¶ 28, ¶ 30, ¶ 31, ¶ 32, ¶ 33, ¶ 36) interview process by which Rampy was offered employment by ICI.

42. At no time did ICI ever rescind, retract, or modify the terms of Exhibit A hereto, the ICI mandates to Rampy concerning Exhibit A hereto, or any other directives explained (as aforesaid ¶ 23, ¶ 24, ¶ 27, ¶ 28, ¶ 30, ¶ 31, ¶ 32, ¶ 33, ¶ 36) to Rampy before May 17, 1989 and many times, after May 17, 1989, reiterated to Rampy.

43. During the tenure of Rampy as an employee of ICI, Rampy performed all of the normal everyday functions of a personnel manager with plant-wide responsibilities at the Olive Branch Plant.

44. During the tenure of Rampy as an employee of ICI, Rampy was required to terminate or cause to be terminated the employment of some ICI employees for incompetence and/or misconduct.

45. During the tenure of Rampy as an employee of ICI, Rampy interacted, on virtually a daily basis, with the ICI plant manager of the Olive Branch Plant concerning various aspects of management of the Olive Branch Plant.

46. During the tenure of Rampy as an employee of ICI, Rampy was never provided a directive, expressly nor impliedly, to change methodologies used by Rampy in the implementation thereof, from any superior at ICI.

47. During the tenure of Rampy as an employee of ICI, Rampy participated in regularly and specially scheduled management staff meetings convened at the Olive Branch Plant.

48. During the tenure of Rampy as an employee of ICI, Rampy remained a wholehearted advocate, in accordance with ICI instructions to Rampy, of the aforesaid (¶ 23, ¶ 26) significant and material changes, including, but not limited to, pay-for-knowledge, employee discipline, self-directed work teams, more stringent minimum requirements for hiring, and employee empowerment.

49. During the tenure of Rampy as an employee of ICI, Rampy detected that, at the Olive Branch Plant, employees were abusing alcohol and illicit drugs, including dealing in illicit drugs within and on ICI property, and, as a result, instigated a full scale investigation conducted by an outside investigative company.

50. During the tenure of Rampy as an employee of ICI, Rampy uncovered a custom of systematic employee absenteeism and/or tardiness in a particular subdivision of the Olive Branch Plant and instituted corrective measures which halted a practice, which had endured, while known to supervisory personnel, for years.

51. While Rampy was employed by ICI, Warf, as a member of the management staff at the Olive Branch Plant, reported directly to the plant manager as did Rampy.

52. While a member of the management staff, as aforesaid (¶ 51), Warf was assigned job responsibilities as quality supervisor with supervisory responsibility over inspectors at the Olive Branch Plant.

53. Prior to Rampy being employed by ICI, Warf had been an employee at the Olive Branch Plant both before and after acquisition of the Olive Branch Plant, as aforesaid (¶ 27, ¶ 28, ¶ 29) by ICI.

54. When Rampy assumed employment with ICI, the job responsibilities, as aforesaid (¶ 43), assigned to Rampy by ICI included Rampy being responsible for all personnel functions related to Warf and to report, in this regard, to the plant manager at the Olive Branch Plant.

55. When Rampy assumed employment with ICI, the job responsibilities, as aforesaid (¶ 43), assigned to Rampy by ICI included Rampy being responsible for all personnel functions relative to all of the employees supervised, as aforesaid (¶ 52), by Warf and job performance evaluation of those employees.

56. During the tenure of Rampy as an employee of ICI, Rampy discovered, investigated and called to account Warf, who, while he served as part of the management staff at the Olive Branch Plant, as aforesaid (¶ 51, ¶ 52), was a person who practiced abuse of alcohol and illicit drugs in such a way as to negatively affect job performance of Warf and other employees including those for whom he had supervisory responsibility.

57. Rampy reported to the plant manager at the Olive Branch Plant the alcohol and illicit drug abuse by Warf and the effect of same on the job performance of Warf and other employees.

58. As a result of the findings of Rampy concerning the alcohol and illicit drug abuse of Warf, Rampy was involved with the manager of the Olive Branch Plant in counseling and/or reprimanding Warf.

59. Rampy recommended, as a condition of continued employment by ICI, that Warf submit to therapeutic counseling and treatment by a psychologist.

60. In spite of the recommendation of Rampy, as aforementioned (¶ 59), Warf refused counseling.

61. In carrying out job responsibilities assigned by ICI to Rampy, Rampy discovered that Warf, as a pattern of conduct established over a period of years, was continuing with a habit of relating to female employees of ICI at the Olive Branch Plant by sexual advances, overtures and insinuations.

62. As a result of the knowledge acquired by Rampy, as aforesaid (¶ 61), about the sexual harassment and other sexual activity of Warf, as it related to female employees of ICI at the Olive Branch Plant and at ICI Headquarters, Rampy investigated the matter, interviewing female employees who had been affected thereby and reported the result of the investigation to the plant manager at the Olive Branch Plant.

63. In the course of the aforesaid (¶ 62), investigation, Rampy discovered that Warf was actively involved in off-premises sexual relations with one or more female employees at the Olive Branch Plant and that the job performance of a particular female employee was compromised by and as a result of her sexual relationship with Warf.

64. In carrying out the job responsibilities assigned to Rampy by ICI, Rampy called Warf to account for the sexual conduct above described (¶ 61, ¶ 62, ¶ 63).

65. Rampy recommended to the plant manager at the Olive Branch Plant that the employment by ICI of Warf be terminated.

66. Warf intensely disliked Rampy.

67. Warf openly expressed the aforesaid (¶ 75) intense dislike for Rampy to ICI personnel.

68. The reason Warf intensely disliked Rampy was because Rampy actively preferred the best interest of ICI over the habits and personal proclivities of Warf which were against the interest of ICI.

69. Warf was removed by ICI from the management staff of the Olive Branch Plant.

70. Warf was transferred to a job which required him to report directly to ICI Headquarters.

71. After Rampy commenced employment with ICI, Martin, as safety coordinator for the Olive Branch Plant, reported directly to Rampy commencing in January 1991.

72. Martin, arbitrarily, had been placed in the position of plant safety coordinator by the owners from which ICI acquired the Olive Branch Plant, as aforesaid (¶ 27), shortly before the acquisition, for no reason other than that the former owners had never had a plant safety coordinator but deemed having a plant safety coordinator an important ingredient in effectuating the sale of the Olive Branch Plant to ICI.

73. When Rampy assumed her employment with ICI, Martin was unqualified to be the plant safety coordinator.

74. Shortly after assuming employment with ICI and discovering that Martin was not qualified to be plant safety coordinator, as aforesaid (¶ 72, ¶ 73), Rampy began and continued training Martin with the intent of providing Martin with knowledge and skills which would qualify Martin to be plant safety coordinator.

75. Rampy worked one-on-one with Martin intensely and arranged for off-premises seminars and other educational and on-the-job training in an effort to inculcate Martin with qualifications for the position of plant safety coordinator.

76. Rampy provided Martin with detailed checklists and a very structured job description to assist Martin in performance of the job responsibilities of the plant safety coordinator.

77. Rampy arranged for Martin to receive additional compensation as an incentive so that Martin might be motivated to acquire the knowledge and skill required of a plant safety coordinator and execute the job responsibilities of a plant safety coordinator.

78. After approximately twenty-four months of intensely working with Martin as aforesaid (¶ 74, ¶ 75, ¶ 76, ¶ 77), Martin never performed the job responsibilities of the plant safety coordinator adequately; nonetheless, Rampy remained committed to continuing the process of training Martin.

79. On or about January 31, 1992, Martin, unilaterally, quit Martin's employment with ICI.

80. Martin personally wished to retain the position of plant safety coordinator without the necessity of obtaining knowledge and skills necessary to execute the job responsibility of plant safety coordinator and without performing the responsibilities of plant safety coordinator at a level minimally necessary to protect the interest of ICI.

81. Martin intensely disliked Rampy.

82. Martin, openly, among ICI employees and others, expressed Martin's dislike for Rampy.

83. Martin blamed Rampy for the fact that Martin terminated Martin's employment at ICI.

84. Martin disliked Rampy because Rampy preferred the best interest of ICI over the proclivities and personal desires of Martin which were adverse to the interest of ICI.

85. Elmore was employed by ICI as a plant employee at the Olive Branch Plant in October 1990 and was subsequently promoted, in March 1991, to a clerical office employee at the Olive Branch Plant.

86. In carrying out the job responsibilities assigned by ICI to Rampy, it came to the attention of Rampy that Elmore had developed a substantial habit of absenteeism and prevarication which impacted the job performance of Elmore.

87. Having discovered the absenteeism and prevarication, as aforesaid (¶ 86), Rampy confronted Elmore and continued, over a period of approximately nine months, to assist Elmore in corrective actions.

88. Even though Rampy, as aforesaid (¶ 87), worked with Elmore to correct the aforesaid (¶ 86) job performance problems of Elmore, the problems persisted without significant correction.

89. Elmore's dislike of Rampy is because Rampy preferred the best interest of ICI over the proclivities and desires of Elmore to retain her position as an employee of ICI without the necessity to conform performance of the job responsibilities assigned to Elmore to a manner consistent with the best interest of ICI.

90. In February 1992, Elmore, unilaterally, quit her employment with ICI.

91. Elmore intensely disliked Rampy.

92. Elmore spoke openly among ICI employees of her dislike for Rampy.

93. During the interview process, as aforesaid (¶ 19, ¶ 20, ¶ 21) Rampy was told by ICI that a career path with ICI would be developed for Rampy preparing her to replace Bill Weber when Bill Weber vacated the position he then held as Director of Personnel for ICI company-wide.

94. In selecting a replacement for Bill Weber, ICI considered, for the vacated position, both Rampy and Hurley.

95. In January 1991, Hurley assumed, by promotion, the position of Director of Personnel for ICI company-wide, after the position was vacated by Bill Weber.

96. Though disappointed at not being selected to replace Bill Weber, Rampy, because the president of ICI told Rampy in November 1990 she had to be passed over because she had been employed by ICI less than two years, did not consider herself slighted.

97. After assuming the position of Director of Personnel for ICI, company-wide, Hurley, knowing that Rampy was in a career path leading to the company-wide position of Director of Personnel for ICI and knowing that Rampy found favor with some ICI executives and knowing that Rampy continued to be employed by ICI in a position where Rampy's successful performance of extraordinary job assignment would attract favorable attention of ICI executives, Hurley's retention of the position of Director of Personnel might be threatened by promotion of Rampy.

98. Hurley, personally (apart from the interest of ICI), considered himself to have a vested economic interest in Rampy proving unsuccessful as [Editor's Note: text omitted in copy]

99. Hurley, personally (apart from the interest of ICI), considered himself to have a vested economic interest in Rampy being terminated, in an unfavorable light, from employment with ICI.

100. Though the job responsibilities of Rampy required Rampy to report directly to the plant manager at the Olive Branch Plant, Hurley, having responsibility for personnel functions of ICI company-wide, was responsible to report to Richard Ward, president of ICI at ICI Headquarters, concerning all personnel functions at all ICI facilities, including the Olive Branch Plant.

101. The plant manager, to whom Rampy directly reported at the Olive Branch Plant, reported directly to McCoy, prior to October 1991, and, thereafter, to Jerry Trokey, who replaced McCoy when McCoy was promoted.

102. Rampy, at the time she was told by the president of ICI why Hurley was given the position of Director of Personnel, was told by the president that she was promotable and could expect a promotion within the next year to eighteen months.

103. Generally, as Rampy performed the job responsibilities assigned by ICI to Rampy, divisions of opinion, among ICI personnel at the Olive Branch Plant surfaced dependent on the attitude of particular employees concerning Rampy's intolerance for job performance inconsistent with the best interest of ICI and the necessity to change work habits to conform with the instruction given by ICI to Rampy as aforesaid (¶ 48).

104. Generally, employees at the Olive Branch Plant who were imbued with a work ethic consistent with the best interest of ICI and philosophies consistent with the objectives which ICI had instructed Rampy to achieve, as aforesaid (¶ 23, ¶ 24, ¶ 27, ¶ 28, ¶ 30, ¶ 31, ¶ 32, ¶ 33, ¶ 36, ¶ 42, ¶ 46, ¶ 48 ¶ 106), were enthusiastic about those changes and the intolerance of Rampy for habits, on the job and otherwise, of employees which conflicted with the best interests of ICI and, therefore, were supportive of Rampy.

105. Generally, employees of ICI at the Olive Branch Plant who lacked a work ethic consistent with preferring the best interest of ICI (over personal habits and desires which were in conflict with the best interest of ICI and with the objectives, detailed in Exhibit A hereto, which ICI, as aforesaid (¶ 23, ¶ 24, ¶ 27, ¶ 28, ¶ 30, ¶ 31, ¶ 32, ¶ 33, ¶ 36, ¶ 42, ¶ 48 ¶ 106), had in-

structed Rampy to achieve and who were displeased with Rampy's intolerance for habits of employees which conflicted with the interests of ICI) were disenchanted and not supportive of Rampy.

106. During the tenure of Rampy as an employee of ICI, Rampy never failed, flinched, shirked nor otherwise neglected to perform job responsibilities as aforesaid (¶ 104, ¶ 105) in strict conformance with the instructions which were first provided to Rampy before Rampy agreed to accept the offer of employment by ICI and which were many times repeated to Rampy after and during Rampy's employment by ICI.

107. During the tenure of Rampy as an employee of ICI, at all times, Rampy was the recipient of favorable review by ICI superiors responsible for the supervision of Rampy.

108. During the tenure of Rampy as an employee of ICI, Rampy could not be persuaded to deviate from execution of her job responsibilities by threat or intimidation from ICI employees.

### ACTIONABLE FACTS

109. From an animus of fear that his job security with ICI was threatened if Rampy successfully achieved the objectives, stated in Exhibit A hereto, as aforesaid (¶ 48), and other responsibilities (¶ 107, ¶ 108) assigned Rampy by ICI, Hurley sought for ways to undermine successful job performance by Rampy and for means by which to have the employment of Rampy at ICI terminated on the pretense that Rampy's employment by ICI was against the best interest of ICI.

110. From an animus motivated by revenge and a fear that, so long as Rampy remained an employee of ICI, his job security with ICI was threatened, Warf engaged in conduct designed by Warf to undermine the ability of Rampy to perform job responsibilities assigned to Rampy by ICI, primarily, by fomenting discontent among employees of ICI at the Olive Branch Plant and ICI Headquarters by use of prevarication and distortion.

111. From an animus motivated by revenge, both before and after Martin's unilateral termination, as aforesaid (¶ 79), of employment at ICI, Martin engaged in conduct designed by Martin to undermine the ability of Rampy to perform job responsibilities assigned to Rampy by ICI, primarily, by fomenting discontent among employees of ICI at the Olive Branch Plant by use of prevarication and distortion.

112. From an animus motivated by revenge, both before and after Elmore's unilateral termination, as aforesaid (¶ 90), of employment at ICI, Elmore engaged in conduct designed by Elmore to undermine the ability of Rampy to perform job responsibilities assigned to Rampy by ICI, primarily, by fomenting discontent among employees of ICI at the Olive Branch Plant by use of prevarication and distortion.

113. Hurley, Warf, Elmore and Martin each, separately, and for separate reasons, individually formed the animus, alleged separately as to each (¶ 109, ¶ 110, ¶ 111, ¶ 112), and separately commenced acting in accord with the separate animus of each.

114. As Warf, Elmore and Martin each separately acted on an out of the aforesaid (¶ 109, ¶ 110, ¶ 111, ¶ 112) animus, each discovered that the other shared a common purpose with respect to undermining and causing ICI to terminate the employment of Rampy.

115. Hurley discovered that Warf, Martin and Elmore had the same objective as Hurley to undermine the ability of Rampy to perform Rampy's job responsibilities and to cause Rampy's employment by ICI to be terminated and that Warf, Martin and Elmore were actively pursuing accomplishment of that objective.

116. As Hurley, Martin, Elmore and Warf each discovered their common objective and the fact that each was willing to act to accomplish that objective, each tacitly and/or explicitly agreed one with the other to join together by combining their separate efforts to achieve their common objective by joint action.

117. In furtherance of accomplishing the common objective by the aforesaid (¶ 116)

combined action, Warf, Elmore and Martin, separately and together, over an extended period of time, made contact with various employees of ICI at the Olive Branch Plant maliciously spreading false information about Rampy, soliciting and stirring up discontent directed toward Rampy because of the effect of Rampy, as aforesaid (¶ 106, ¶ 107, ¶ 108), carrying out directives given to Rampy by ICI, and encouraging ICI employees at the Olive Branch Plant to speak out against Rampy.

118. In furtherance of accomplishing the common objective by the aforesaid (¶ 116) combined action, Warf, Martin and Elmore each spoke with Hurley maliciously conveying to Hurley information about Rampy to provide Hurley with a source for information, which Hurley knew or should have known was false and or fabricated, by fomentation of discontent, as aforesaid (¶ 117), so that Hurley could maliciously use same as an excuse to target Rampy as the object of an investigation, in fomenting (among ICI executives) unwarranted questions about the job performance of Rampy and/or the suitability of Rampy as an employee of ICI.

119. In furtherance of accomplishing the common objective by the aforesaid (¶ 116) combined action, Hurley, on the pretense of "surveying" attitudes of employees at the Olive Branch Plant, prepared or had prepared a written questionnaire for use in collecting responses of each of the ICI employees at the Olive Branch Plant.

120. In furtherance of accomplishing the common objective by the aforesaid (¶ 116) combined action, immediately prior to conducting the "survey," Warf, Elmore and Martin contacted various employees at the Olive Branch Plant and encouraged said employees to contact other employees encouraging as many ICI employees as could be encouraged so to do to give bad reports about Rampy in response to the upcoming "survey" in order to create a basis for Hurley to secure termination of the employment of Rampy by ICI.

121. In furtherance of accomplishing the common objective by the aforesaid (¶ 116) combined action, Hurley, through other ICI employees, conducted a "survey" of ICI employees at the Olive Branch Plant.

122. In furtherance of accomplishing the common objective by the aforesaid (¶ 116) combined action, after Rampy challenged the reliability of the "survey," Hurley, through other ICI employees, conducted a subsequent "survey."

123. In furtherance of accomplishing the common objective by the aforesaid (¶ 116) combined action, again, for the same purpose and objective aforesaid (¶ 114, ¶ 115, ¶ 116), Warf, Elmore and Martin contacted various ICI employees encouraging said employees as aforesaid (¶ 120).

124. In furtherance of accomplishing the common objective by the aforesaid (¶ 116) combined action, Hurley conducted the aforesaid (¶ 119, ¶ 120, ¶ 121, ¶ 122, ¶ 123) "surveys" so as to discourage favorable comment by ICI employees at the Olive Branch Plant about Rampy or the job performance of Rampy.

125. In furtherance of accomplishing the common objective by the aforesaid (¶ 116) combined action, Hurley designed or directed that the aforesaid (¶ 119, ¶ 120, ¶ 121, ¶ 122, ¶ 123) "surveys" be designed and the methodology for collecting the information to be recorded on the "surveys" to accomplish only the illegitimate common objective of Hurley, Warf, Elmore and Martin as aforedescribed (¶ 114, ¶ 115, ¶ 116).

126. In furtherance of accomplishing the common objective by the aforesaid (¶ 116) combined action, Hurley full-well knew that the aforesaid (¶ 119, ¶ 120, ¶ 121, ¶ 122, ¶ 123) "surveys" were shams designed to provide fabricated evidence to cover up the malicious intent of Hurley to terminate or cause to be terminated the employment of Rampy by ICI as the achievement of the common objective, as aforesaid (¶ 114, ¶ 115, ¶ 116), Hurley, Warf, Elmore and Martin.

127. In furtherance of accomplishing the common objective by the aforesaid (¶ 116) combined action, Hurley maliciously used the false information, fabricated by fomentation of discontent, as aforesaid (¶ 117), conveyed by Warf, Elmore and Martin,

and information collected by the aforesaid (¶ 119, ¶ 120, ¶ 121, ¶ 122, ¶ 123) sham "surveys," all of which was combined with the personal persuasion of Hurley, to cause issuance of a directive, to the plant manager at the Olive Branch Plant, to terminate the employment of Rampy by ICI.

128. On March 24, 1992, the plant manager at the Olive Branch Plant unilaterally terminated the employment of Rampy against Rampy's will, informed Rampy of the termination and directed Rampy to exit the premises, after collecting her personal belongings.

### COUNT ONE

(Breach Of At Will Employment Contract)

129. Rampy and ICI, on May 22, 1989, consummated an at will employment contract, as aforesaid (¶ 18, ¶ 19, ¶ 20, ¶ 21, ¶ 23, ¶ 24, ¶ 25, ¶ 26, ¶ 27, ¶ 28, ¶ 29, ¶ 30, ¶ 31, ¶ 32, ¶ 33, ¶ 34, ¶ 35, ¶ 36, ¶ 42, ¶ 93), which persisted throughout the employment of Rampy by ICI, i.e., until March 24, 1992.

130. The at will employment contract, as aforesaid (¶ 129), between Rampy and ICI included an implied in law covenant of good faith and fair dealing.

131. The at will employment contract aforesaid (¶ 129) between Rampy and ICI, as aforesaid (¶ 106, ¶ 107, ¶ 108, ¶ 48, ¶ 46, ¶ 42) was never breached, in any way, by Rampy.

132. The at will employment contract, as aforesaid (¶ 129) between Rampy and ICI included an implied in law termination provision prohibiting termination by either party except on reasonable advance notice.

133. ICI, before terminating the at will employment contract between ICI and Rampy, by the hereinafter alleged (¶ 140, ¶ 141, ¶ 142) breach of duty of loyalty and fair dealing, the hereinafter alleged (¶ 143, ¶ 144, ¶ 145) negligent supervision, the hereinafter alleged (¶ 146, ¶ 147, ¶ 148, ¶ 149) conspiracy to injure and the hereinafter alleged (¶ 150, ¶ 151) wrongful termination, breached the at will employment contract between Rampy and ICI by violating the implied in law covenant of good faith and fair dealing.

134. By violating the implied in law provision requiring termination only after reasonable advance notice, ICI, as aforesaid (¶ 128), breached the at will employment contract between Rampy and ICI.

### COUNT TWO

(Promissory Estoppel/ICI)

135. As a precondition to the agreement of Rampy to accept employment offered by ICI, ICI promised Rampy as aforesaid (¶ 36).

136. Without the aforesaid (¶ 135) promise of ICI to Rampy, Rampy would not have agreed to accept employment by ICI.

137. Rampy, at all times while employed by ICI, competently performed job responsibilities assigned to Rampy by ICI.

138. Because of what ICI perceived to be resistance, as aforesaid (¶ 105, ¶ 117, ¶ 118, ¶ 119, ¶ 120, ¶ 121, ¶ 122, ¶ 123, ¶ 124, ¶ 125, ¶ 126, ¶ 127), from employees impacted in a way not satisfying to the employees by Rampy's faithfulness to her job responsibilities, ICI terminated the employment of Rampy, thereby, breaching the aforesaid (¶ 135) promise to Rampy.

139. Rampy changed her position to her detriment in reliance on the aforesaid promise (¶ 135) of ICI by foregoing other employment opportunities, as aforesaid (¶ 22), from May 17, 1989 through March 24, 1992, and, for the same period of time, devoting mental and physical energy to the loyal service of ICI depending on ICI to remain faithful to its aforesaid (¶ 135) promise.

### COUNT THREE

(Breach Of Duty Of Loyalty
And Fair Play/ICI)

140. The aforesaid (¶ 42, ¶ 43, ¶ 44, ¶ 45, ¶ 46, ¶ 47, ¶ 48, ¶ 49, ¶ 50, ¶ 56, ¶ 57, ¶ 58, ¶ 59, ¶ 61, ¶ 62, ¶ 63, ¶ 64, ¶ 65, ¶ 74, ¶ 75, ¶ 76, ¶ 77, ¶ 78, ¶ 86, ¶ 87, ¶ 104, ¶ 106, ¶ 107, ¶ 108) employment relationship between Rampy and ICI created a mutual duty of loyalty and fair play on the part of

Rampy toward ICI and on the part of ICI toward Rampy.

141. At all times while employed by ICI and, thereafter, Rampy, without deviation, conducted herself, as aforesaid, (¶ 42, ¶ 46, ¶ 48, ¶ 106, ¶ 107, ¶ 108) consistent with the duty of loyalty and fair play which Rampy owed ICI.

142. By the conduct more particularly alleged hereinbefore (¶ 105, ¶ 117, ¶ 118, ¶ 119, ¶ 120, ¶ 121, ¶ 122, ¶ 123, ¶ 124, ¶ 125, ¶ 126, ¶ 127) ICI breached its duty of loyalty and fair play to Rampy.

### COUNT FOUR

(Negligent Supervision/ICI)

143. While Rampy was employed by ICI, ICI owed a duty of care to Rampy in supervising Rampy and persons with supervisory authority over Rampy.

144. ICI, as more particularly alleged in ¶ 105, ¶ 117, ¶ 118, ¶ 119, ¶ 120, ¶ 121, ¶ 122, ¶ 123, ¶ 124, ¶ 125, ¶ 126, ¶ 127, ¶ 128 above, breached the duty of care owed by ICI to Rampy in failing to provide supervision of ICI employees minimally required by the exercise of due care under the circumstances.

145. The aforesaid (¶ 144) negligent supervision of ICI employees, directly and proximately, caused Rampy to be injured in her person and her property.

### COUNT FIVE

(Conspiracy To Injure/Hurley, Warf, Martin, Elmore)

146. Hurley, Warf, Elmore and Martin, for the aforesaid (¶ 114, ¶ 115, ¶ 116) purpose, tacitly and/or explicitly agreed, with malice and intentionally, one with the other, as aforesaid (¶ 109, ¶ 110, ¶ 111, ¶ 112, ¶ 113, ¶ 114, ¶ 115, ¶ 116), to jointly injure Rampy in her property by causing ICI to terminate the employment of Rampy with ICI and engaged in overt acts, as aforesaid (¶ 117, ¶ 118, ¶ 119, ¶ 120, ¶ 121, ¶ 122, ¶ 123, ¶ 124, ¶ 125, ¶ 126, ¶ 127) in furtherance of said purpose.

147. Hurley, Warf, Elmore and Martin, for the aforesaid (¶ 114, ¶ 115, ¶ 116) purpose, tacitly and/or explicitly, with malice and intentionally, agreed one with the other, as aforesaid (¶ 109, ¶ 110, ¶ 111, ¶ 112, ¶ 113, ¶ 114, ¶ 115, ¶ 116), to jointly injure Rampy in her person by causing Rampy to suffer mental distress and anguish in furtherance of said purpose.

### COUNT SIX

(Vicarious Liability For Conspiracy/ICI)

148. The actions of Hurley, Warf, Martin and Elmore, in conspiring to injure Rampy in her property and person, as aforesaid (¶ 146, ¶ 147), were engaged in by Hurley, Warf, Martin and Elmore, with Hurley and Warf, acting under the apparent authority granted them as employees of ICI.

149. ICI, while not itself a co-conspirator with Hurley, Warf, Elmore and Martin, is responsible to Rampy for the injury suffered by Rampy, as aforesaid (¶ 146, ¶ 147), directly and proximately caused by the conspiracy of Hurley, Warf, Martin and Elmore.

### COUNT SEVEN

(Wrongful Termination/ICI)

150. By terminating the employment of Rampy, though at will, as aforesaid (¶ 105, ¶ 117, ¶ 118, ¶ 119, ¶ 120, ¶ 121, ¶ 122, ¶ 123, ¶ 124, ¶ 125, ¶ 126, ¶ 127, ¶ 128), ICI wrongfully terminated the employment of Rampy.

151. By the wrongful termination by ICI of the employment of Rampy, as aforesaid (¶ 150), ICI, directly and proximately, caused Rampy to suffer injury to her person and property.

In her complaint, plaintiff alleges that defendants' conduct gave rise to the following causes of action against ICI: wrongful termination of employment, breach of at will employment contract, and breach of an alleged duty of loyalty/fair play. In addition, plaintiff alleges causes of action on the theories of promissory estoppel, negligent supervision, civil conspiracy, and vicarious liability for civil conspiracy. It should be noted that at the time these alleged incidents took place, plaintiff was an employee of ICI at its Olive

Branch, Mississippi plant. Plaintiff seeks relief in the courts of this state under alleged pendent jurisdiction, and asks us to apply Mississippi law.

█ Prior to addressing the issues themselves, we must first deal with plaintiff's contention that the ruling of the chancellor dismissing her complaint with prejudice was not only incorrect, but unjust. While plaintiff acknowledges that the law of this state applies to procedural matters, she does not cite any legal authority for her contention that the dismissal, if correct, should have been without prejudice.

Under Tennessee law, a dismissal for failure to state a claim under T.R.C.P. 12.02(6) is a dismissal on the merits. *Dyer v. Intera Corp.*, 870 F.2d 1063 (6th Cir.1989). The *Dyer* court, applying Tennessee law as well as Tennessee Rules of Civil Procedure, stated in part as follows:

No reported Tennessee cases directly address the issue of whether dismissal for failure to state a claim upon which relief can be granted is a decision on the merits. Inferences to be drawn from other legal sources, however, lead us to the conclusion that the result is clear. Rule 12.02(6) of the Tennessee Rules of Civil Procedure was the procedural basis for the dismissal of Dyer's complaint for failure to state a claim on which relief can be granted in the state trial court. A rule 12.02(6) motion to dismiss, like the demurrer under earlier Tennessee law, test the legal sufficiency of the party's pleading. *See Cornpropst v. Sloan*, 528 S.W.2d 188, 190 (Tenn.1975). In a case predating Rule 12.02(6), the Tennessee Supreme Court held that the sustaining of a demurrer had the effect of a decision on the merits regardless of whether the factual allegations are sufficient to support a cause of action. *Isham v. City of Harriman*, 223 Tenn. 461, 447 S.W.2d 364 (1969).

Tennessee Rule of Civil Procedure 12.02(6) is based upon Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* Tenn.R.Civ.Proc. 12, advisory committee notes. In the federal courts, a dismissal pursuant to 12(b)(6) is considered a decision on the merits with full res judicata effect. . . . In *Bartsch v. Chamberlin,* [266 F.2d 357 (6th Cir.1959)] this court held that a Rule 12(b)(6) dismissal, by operation of Rule 41(b) Fed.R.Civ.Proc., is a decision on the merits. 266 F.2d at 358. This conclusion is supported by the language of Rule 41.02(3) of the Tennessee Rules of Civil Procedure, which states:

Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision *and any dismissal not provided for in this Rule 41,* other than a dismissal for lack of jurisdiction or lack of an indispensable party, operates as an adjudication upon the merits.

*Dyer,* 870 F.2d at 1066 (some citations omitted) (emphasis added by *Dyer* court). Based upon this authority, if the chancellor properly dismissed the complaint, this was a decision on the merits and would have the effect of being *res judicata.*

## I. The Claims of Wrongful Termination, Breach of At Will Employment Contract, and Breach of Loyalty and/or Fair Play

### A. Wrongful Termination

█ The employment at will doctrine has long been alive and well in Mississippi. *See McArn v. Allied Bruce–Terminix Co.,* 626 So.2d 603 (Miss.1993). While plaintiff admits in her complaint that she was an employee at will, she claims the actions of ICI amounted to wrongful termination. In regard to the status of the law of employment at will, the Mississippi Supreme Court has stated:

Mississippi follows the common law rule that a contract of employment for an indefinite term may be terminated at the will of either party. The employee can quit at will; the employer can terminate at will. This means either the employer or the employee may have a good reason, a wrong reason, or no reason for terminating the employment contract.

*Kelly v. Mississippi Valley Gas Co.,* 397 So.2d 874, 874–75 (Miss.1981) (citations omitted).

In the recent case of *McArn v. Allied Bruce–Terminix Co. Inc.,* 626 So.2d 603 (Miss.1993), the Mississippi Supreme Court created a very narrow public policy exception

to the employment at will doctrine. In *McArn*, the court gave a brief overview of recent Mississippi cases on this subject, and then proceeded to fashion the exception:

> However, we did note in *Shaw [v. Burchfield*, 481 So.2d 247 (Miss.1985)] that "under fire is the notion that, absent an employment contract expressly providing to the contrary, an employee may be discharged at the employer's will for good reason, bad reason, or no reason at all, excepting only reasons independently declared legally impermissible." *Id.* at 253–54; *See Mississippi Employment Security Commission v. Philadelphia Municipal Separate School District*, 437 So.2d 388, 397 (Miss.1983).
>
> In *Perry v. Sears, Roebuck & Co.*, 508 So.2d 1086 [2 IER Cases 805] (Miss.1987) we were faced with an employee who brought an action against his former employer for breach of contract and wrongful termination. We noted that Mississippi has followed the employment at will doctrine since 1858. *Id.* at 1088. We also said that wrongful discharge actions, which are not founded on contract, essentially sound in tort. *Id.* at 1089. The theory is based on an implied covenant of good faith and fair dealing, when breached by malicious termination or harassment gives the victim a tort action for wrongful discharge. *Id.* However, in *Perry* we concluded that even if we adopted that approach, *Perry* would probably not prevail on the facts of the record before us. *Id.*
>
> In *Empiregas Gas, Inc. of Kosciusko v. Bain*, 599 So.2d 971, 974 (Miss.1992), we again noted Mississippi's long-standing adherence to the common-law rule of termination at will, but addressed Bain's termination for "wrong reasons" in order to afford him all the equitable relief to which he was entitled. The main thrust of *Bain* was that an employee who had been discharged in bad faith would not have the terms of a previously executed non-competition agreement enforced against him. *Id.* at 977.
>
> In *Bobbitt v. The Orchard, Ltd.*, 603 So.2d 356, 361 (Miss.1992), we made reference to *Shaw* and stated that we would be looking for a wiser and more humane alternative to the terminable at will rule in employment contracts. In *Bobbitt*, unlike *McArn*, an employee manual set forth the administrative procedures which would be followed after employee misconduct or incompetence.
>
> . . . . .
>
> We are of the opinion that there should be in at least two circumstances, a narrow public policy exception to the employment at will doctrine and this should be so whether there is a written contract or not: (1) an employee who refuses to participate in an illegal act as in *Laws* shall not be barred by the common law rule of employment at will from bringing an action in tort for damages against his employer; (2) an employee who is discharged for reporting illegal acts of his employer to the employer or anyone else is not barred by the employment at will doctrine from bringing an acting in tort for damages against his employer. To this limited extent this Court declares there is a public policy exception to the age old common law rule of employment at will. These exceptions apply even where there is "privately made law" governing the employment relationship, where the illegal activity either declined by the employee or reported by him affects third parties among the general public, though they are not parties to the lawsuit.

*McArn*, 626 So.2d at 606–07.

*McArn* clearly represents the current status of the law in Mississippi as to the employment at will doctrine. As a court of Tennessee entertaining a cause of action in which the laws of a sister state are to be applied, our role and duty is to apply the law of Mississippi as it currently stands. *Smith v. Priority Transp., Inc.*, No. 02–A01–9203–CV–00074 (Tenn.App., Feb. 3, 1993); *see also Hataway v. McKinley*, 830 S.W.2d 53 (Tenn. 1992). It is not our role to attempt to chart new courses in the laws of our sister state; instead, we must follow the laws already well established.

In our opinion, the chancellor was correct in dismissing all claims against all defendants regarding wrongful termination. The two narrow public policy exceptions created in

*McArn,* namely, an employee who refuses to take part in an illegal act or one who is discharged for reporting illegal acts of his employer, are not applicable to the case at bar. While plaintiff's complaint alleges that she "discovered" drug use among her fellow employees, nowhere in her complaint does she allege that she was discharged as a result of any of these discoveries or of any action that she took in response thereto. In addition, while she alleged in her complaint that defendant Warf "engaged in sexual harassment," nowhere in her complaint does she allege that she was fired as a result of any action she took in reaction to this discovery. By the same token, while plaintiff alleged she discovered a long-standing scheme of falsifying payroll records, again, she failed to allege that she was fired for reporting this alleged activity or that her termination was in any way related to that discovery.

Nowhere in her complaint does she allege that she was wrongfully discharged for refusing to participate in illegal activity or for reporting such illegal activity to her employer or anyone else. Accordingly, we find this issue to be without merit.

### B. Breach of At Will Employment Contract and Duty of Loyalty/Fair Play

■ Plaintiff contends that ICI breached her "at will employment contract" by: (1) failing to give her reasonable notice of her termination; and (2) by violating some sort of implied duty of loyalty or fair play. We will address each sub-issue separately.

#### 1. Notice of Termination

Although plaintiff readily acknowledges that she was an at will employee at the time of her termination, nonetheless she takes the position that ICI breached an employment at will contract by failing to give her proper notice of termination. As to this cause of action, the parties are in agreement that Mississippi law applies. Having said that, a

reading of plaintiff's brief reveals that she has failed to set forth any Mississippi authority in support of her proposition that proper notice of some type must be given in order to properly discharge an employee at will.[3] As plaintiff has failed to cite any legal authority in support of this proposition, this court is of the opinion that she has waived our consideration of this issue. T.R.A.P. 27; RULES OF THE COURT OF APPEALS 6; *Wilhite v. Brownsville Concrete Co.,* 798 S.W.2d 772, 775 (Tenn.App.1990).

■ In the event we are in error as to this waiver, which we in no way concede, we find this issue to be without merit. No Mississippi appellate court decision has been cited to us, nor have we found one, requiring notice before discharging an at will employee. Mississippi law only requires notice when (a) a contractual provision expressly or impliedly requires notice, or (b) if the contract is so indefinite as to its length in time in which reasonable notice upon termination was implied. *See Mississippi Bank v. Latch,* 433 So.2d 946 (Miss.1983). On this basis as well, this issue is without merit.

#### 2. Duty of Loyalty/Fair Play

■ Plaintiff contends that ICI breached its "duty of loyalty and fair play." As part of this allegation, plaintiff contends that an employer's duty of loyalty to an employee is recognized under Mississippi law, and that the duty of fair dealing or fair play has grown out of this duty of loyalty. For this proposition, she cites *Derouen v. Murray,* 604 So.2d 1086 (Miss.1992). In our opinion, plaintiff's reliance upon *Derouen* is misplaced. In *Derouen,* the court was dealing with an entirely different type of duty—one that arises out of the fiduciary relationship that an officer or director has to his corporation and shareholders.

Furthermore, in *Perry v. Sears, Roebuck & Co.,* 508 So.2d 1086 (Miss.1987), the Su-

---

3. Plaintiff does cite an unreported Tennessee opinion authored by this court, *Plumley Rubber Co. v. Alexander,* 1989 WL 105631 1989 Tenn. App. LEXIS 598 (Sept. 12, 1989), and states "[t]here is no reason to believe that Mississippi law is any different than Tennessee Law (sic) on

this point." Given the admission by plaintiff that Mississippi law governs this dispute, we consider plaintiff to have failed to cite any appropriate authority in support of her lack of notice argument.

preme Court of Mississippi specifically declined to recognize a duty of good faith and fair dealing in the realm of at will employment. *Perry,* 508 So.2d at 1089; *see also Guthrie v. J.C. Penney Co.,* 803 F.2d 202, 211 (5th Cir.1986), (dismissing plaintiff's claim for breach of fiduciary duty on the ground that plaintiff failed to cite any Mississippi law proclaiming the existence of such a fiduciary duty in the context of employment at will). This issue is without merit.

## II. Promissory Estoppel

 As the gravamen of her claim that she is entitled to damages on the basis of promissory estoppel, plaintiff states that by accepting ICI's employment offer, she relied, to her detriment, on ICI's promise to "stand behind her." By accepting the employment offer based on this promise, plaintiff gave up all other employment opportunities. Plaintiff is in error, however, when she states that promissory estoppel is a claim which sounds in tort, and therefore is a separate cause of action aside from the doctrine of employment at will. To the contrary, promissory estoppel is an equitable action based on a quasi-contractual theory, and is therefore not independent of the employment at will doctrine.

Plaintiff's only contention in her complaint asserting her promissory estoppel is that:

> Rampy changed her position to her detriment in reliance on the opportunities, on the aforesaid promise (¶ 135) of ICI by foregoing other employment opportunities, as aforesaid (¶ 22), from May 17, 1989 through March 24, 1992, and, for the same period of time, devoting mental and physical energy to the loyal service of ICI depending on ICI to remain faithful to its aforesaid (¶ 135) promise.[4]

The law of Mississippi on this issue is clear. In *Bowers Window & Door Co. v. Dearman,* 549 So.2d 1309 (Miss.1989), the Mississippi Supreme Court held that the foregoing of other employment opportunities, even for better pay, is a necessary part of participat-

ing in the labor market, and does not constitute sufficient detriment to invoke the doctrine of promissory estoppel. *Dearman,* 549 So.2d at 1315–16; *see also Solomon v. Walgreen Co.,* 975 F.2d 1086 (5th Cir.1992) (change of job or residence, by itself, is insufficient to trigger invocation of promissory estoppel). This issue is without merit.

## III. Negligent Supervision

 As to this claim, plaintiff alleges that ICI breached its alleged duty of care to Rampy in failing to provide adequate supervision over its employees to prevent them from interfering with plaintiff's job performance. More specifically, plaintiff contends that she was injured because ICI breached its alleged duty by putting plaintiff at the mercy of certain ICI employees over whom she had no supervisory authority.

As to this issue, the law is quite clear that a common-law claim by an employee for negligent supervision against an employer is barred by the exclusive remedy provision of the Mississippi Workers' Compensation Law which provides that:

> The liability of an employer to pay compensation shall be exclusive and in place of all other liability of such employer to the employee ... at common law or otherwise from such employer on account of such injury....

Miss.Code Ann. § 71–3–9 (1989); *see also Griffin v. Futorian Corp.,* 533 So.2d 461, 463–64 (Miss.1988); *Campbell v. Jackson Business Forms Co.,* 841 F.Supp. 772, 774 (S.D.Miss.1994). Accordingly, we hold that this issue is without merit.

## IV. Civil Conspiracy & Vicarious Liability for Civil Conspiracy

 Plaintiff alleges that the named individual defendants, along with ICI on a vicarious liability theory, caused her injury when they conspired against her with the purpose of having her dismissed from ICI. Specifically, she asserts that Hurley, Warf and Martin combined their efforts to form a civil

---

4. Moreover, plaintiff asserts in her appellate brief that her claim for promissory estoppel arose during the course of her employment. However, plaintiff allegations in her complaint, which is the sole parameter by which we judge her alleged causes of action, allege only that ICI breached its promise upon which plaintiff detrimentally relied by terminating her employment.

conspiracy to present plaintiff in a false light by fabricating untruths, motivated by malicious objectives, in order to injure her. According to plaintiff, ICI became liable when it joined with the individual "co-conspirators" in consummating this objective.

In *Shaw v. Burchfield*, 481 So.2d 247 (Miss.1985) the Mississippi Supreme Court defined the elements of a civil conspiracy as follows:

> A conspiracy is a combination of persons for the purpose of accomplishing an unlawful purpose or a lawful purpose unlawfully. *Mississippi Power & Light Co. v. Town of Coldwater*, 234 Miss, 615, 636, 106 So.2d 375, 381 (1958). Civil conspiracy resulting in damage may well give rise to a right of recovery under our law. *Bailey v. Richards*, 236 Miss. 523, 537–38, 111 So.2d 402, 407–08 (1959). There is no actionable conspiracy, however, where all that is shown is the exercise in a lawful manner of a right to terminate a contract.

*Shaw*, 481 So.2d at 255 (citations omitted).

In *Pinnix v. Babcock & Wilcox, Inc.*, 689 F.Supp. 634 (N.D.Miss.1988), the United States District Court for the Northern District of Mississippi dealt with a civil conspiracy charge by an at will employee against his employer. The employee in this case contended that as a result of personal animosity, two of defendant's supervisors had engaged in a conspiracy to injure him by tortiously interfering with his employment. The court granted summary judgment in favor of the employer, finding that it could not, as a matter of law, tortiously interfere with an at will employment relationship:

> [The employee] cannot establish the existence of an enforceable employment contract. Obviously, if no enforceable contract existed, then any interference with that contract would be immaterial and does not represent a genuine issue for trial.

*Pinnix*, 689 F.Supp. at 637 (citation omitted). The following from *Shaw*, 481 So.2d at 255, reinforces this position:

> We note that numerous cases from other states recognize that there is no right of recovery on the part of a discharged employee against one said to have interfered with a contract terminable at will. *Rockwell v. Automatic Timing Co.*, 559 F.2d 460 (7th Cir.1977); *Hansen v. Barrett*, 183 F.Supp. 831, 833 (D.Minn.1960); *Noah v. L. Daitch & Co.*, 22 Misc.2d 649, 192 N.Y.S.2d 380, 386 (1959); *Luisoni v. Barth*, 2 Misc.2d 315, 137 N.Y.S.2d 169, 172 (1954); *Davis v. Alwac International, Inc.*, 369 S.W.2d 797, 802 (Tex.1963); *Kingsbery v. Phillips Petroleum Co.*, 315 S.W.2d 561, 576 (Tex.1958). These cases procede [sic] on the premise that, where there has been no breach of contract, conceptualizing a tortious interference fails as a matter of elementary legal logic.

In addition, the *Pinnix* court noted that supervisors, while acting in their capacity as such, were not subject to individual personal liability:

> While acting within the scope of their responsibilities as supervisors, Ervin and Rogers are not subject to individual liability. *Shaw v. Burchfield*, 481 So.2d at 255. Choosing to terminate an at-will employee, even if based on personal animosity, would not have exceeded Ervin's and Rogers' responsibilities. An employer and its agents may terminate an employment at will contract for a good reason, a wrong reason, or no reason. Pinnix's claims against Rogers and Ervin concerning tortious interference with employment relations must therefore be dismissed.

*Pinnix*, 689 F.Supp. at 637 (citations omitted); *see also Vestal v. Oden*, 500 So.2d 954 (Miss.1986) (holding no liability for the employee and agents of the employer for alleged tortious interference with at will employment where plaintiff alleged individual employees tortiously interfered with his at will employment, causing his discharge). This issue is without merit as well.

Accordingly, the decree of the chancellor is affirmed in all respects. Costs in this cause on appeal are taxed to plaintiff, for which execution may issue if necessary.

CRAWFORD and HIGHERS, JJ., concur.