IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
November 22, 2016 Session

**IN RE: YARIEL S., ET AL.**

**Appeal from the Juvenile Court for Knox County**
**No. 53466     Timothy E. Irwin, Judge**

_____

**No. E2016-00939-COA-R3-PT**

_____

This appeal arises from a termination of parental rights. The Tennessee Department of Children's Services ("DCS") filed a petition in the Juvenile Court for Knox County ("the Juvenile Court") seeking to terminate the parental rights of Yaron L. ("Father") to his four minor children Yariel, Yaron, Yariyana, and YariAsia ("the Children"). After a trial, the Juvenile Court terminated Father's parental rights on the grounds of persistent conditions and substantial noncompliance with the permanency plan. The Juvenile Court also found that termination of Father's parental rights was in the Children's best interest. Father appeals to this Court. Father argues that he was not properly notified of the trial, that counsel should have been appointed, and that termination of his parental rights is not in the Children's best interest. We hold that that the evidence in the record on appeal shows, as found by the Juvenile Court, that Father was notified of trial, that Father failed to appear at trial, and that the Juvenile Court did not err in declining to appoint Father counsel when he failed to appear. We also find and hold that the Juvenile Court's determinations regarding grounds for termination and the Children's best interest are supported by clear and convincing evidence. We affirm the judgment of the Juvenile Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and JOHN W. MCCLARTY, JJ., joined.

Robert Lewis Straight, III, Knoxville, Tennessee, for the appellant, Yaron L.

Herbert H. Slatery, III, Attorney General and Reporter, and, W. Derek Green, Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

# OPINION

## Background

In October 2014, DCS became involved with the Children when their mother admitted to an opiate addiction. Both parents acknowledged using marijuana as well. DCS removed the Children from the home of the parents in June 2015 pursuant to a protective custody order. DCS created a permanency plan for the parents. The permanency plan required the parents, in part, to complete drug and alcohol assessments; follow recommendations; refrain from illegal activities; submit to and pass random drug screens; obtain legal sources of income; and, obtain safe and stable housing. Additionally, Father was required to complete an anger management program and provide proof of completion to DCS. In August 2015, the Children were adjudicated dependent and neglected. The Court found that the parents were not in compliance with the permanency plan. Meanwhile, Father tested positive for cocaine and THC and failed to complete two drug screens. Father did eventually complete mental health, drug and alcohol assessments. Father acknowledged a long history of drug abuse. Health Connect diagnosed Father as having severe cannabis disorder and post-traumatic stress disorder.

In March 2016, DCS filed a petition seeking to terminate Father's parental rights to the Children. A summons was issued to Father on March 15, 2016 notifying him that the hearing on the petition would take place on May 3, 2016. The return indicated Father was served personally on March 26, 2016. Father neither responded to the petition in any way nor appeared at the May 3, 2016 hearing. At trial, DCS worker Sarah Brock and the Foster Father testified. Ms. Brock testified:

Q. [Father] was supposed to participate in some intensive outpatient treatment?
A. Yes.
Q. Did he actually participate in any outpatient treatment?
A. He did. He started the outpatient treatment at Health Connect after completing the assessment, a couple weeks after that. He missed almost as many sessions as he attended.
Q. What happened?
A. He was discharged on February the 22nd for non-compliance.

***

Q. You asked him to participate in some anger management?
A. Yes; that's correct.

-2-

Q. And what did he tell you?

A. He reported that he intended to participate in the anger management sessions at Health Connect.

Q. Said he was going to be starting a group in early December?

A. Yes.

Q. Described the curriculum to you?

A. Yes.

Q. Did he ever actually start it?

A. No, he did not.

Q. When you checked with Health Connect, did you determine whether or not there was such a program and whether or not he made any arrangements to start one?

A. They do have a program, but they had not actually spoken to him about starting the anger management services, and they didn't have those plans in place.

Q. So if he had continued and completed the intensive outpatient program that he started, he could have received anger management -

A. Yes.

Q. - - at that facility?

A. Yes.

Q. He just didn't do it?

A. That's correct; he didn't.

***

Q. Have you attempted to drug screen him since he was released from Health Connect for non-compliance?

A. Yes, I have.

Q. What happened?

A. He has failed the drug screens, but he has also refused to take drug screens.

Q. Said he wasn't putting that cotton under his tongue?

A. Yes; that's correct.

Q. How are the children doing?

A. The children are doing really well.

In May 2016, the Juvenile Court entered an order terminating Father's parental rights to the Children on the grounds of persistent conditions and substantial noncompliance with the permanency plan after having found that termination of Father's parental rights was in the Children's best interest. The Juvenile Court also made a specific finding that Father was properly served and notified of the hearing. Father filed

a pro se notice of appeal on a fill-in-the-blank form, asserting "improper service" and that he became of the aware of the May 3, 2016, hearing on April 27, 2016.

The Juvenile Court's order terminating Father's parental rights stated in relevant part:

> 3. The temporary custody of these children was awarded to the State of Tennessee, Department of Children's Services, on June 4, 2015, by order of the Juvenile Court of Knox County, Tennessee; they have been in foster care continuously since that date. An order finding the children dependent and neglected was issued by this Court following a hearing on August 24, 2015. The termination petition was filed against Respondent on March 15, 2016. He was served with a summons and copy of the petition by personal service on March 26, 2016, at . . . Knoxville, Tennessee. The summons clearly stated the date of this hearing and advised Respondent that he could either file an answer before this hearing or personally appear. It also stated that failure to answer or appear could result in the hearing going forward without Respondent's participation and in termination of his parental rights. The Court specifically finds that Respondent was properly served, that he had actual notice of this hearing and of the consequences of failure to appear, and that he has nevertheless failed to answer, appear, or otherwise defend the petition filed against [him]. To the extent that the Rules of Civil Procedure and the Rules of Juvenile Procedure are inconsistent with regard to service of process, the Court finds that the Rules of Civil Procedure should be suspended and that this matter should proceed to adjudication on the date set without any further notice to Respondent, the interests of justice so requiring.

> ***

> 1. These children were removed from their parents' custody due to substance abuse and mental health issues and failure to cooperate with intervention services. In October 2014, at her first prenatal visit during her pregnancy with YariAsia, the children's mother admitted to taking three to four Xanax per day for her nerves. She reported that she was opiate dependent and taking "street" Suboxone. She was referred to CenterPointe and completed detox there in November 2014.
> 2. Mother and baby were clean when YariAsia was born. Both parents admitted regular marijuana use. At a Child & Family Team Meeting on January 5, 2015, the parents agreed to complete mental health assessments and alcohol and drug assessments, to follow resulting

-4-

recommendations, to submit to random drug screens, and to cooperate with the Department of Children's Services. Family Support Services were placed in the home and the children returned to their parents' care.

3. Over the next several months the parents failed to cooperate at all, coming up with one excuse after another. On March 26, 2015, Respondent was positive for marijuana and cocaine. The children's mother was positive for benzodiazepines, buprenorphine, and marijuana. They were warned that they risked losing their children if they did not stop using illicit drugs. The children's mother repeatedly rescheduled appointments at Bradford for an assessment. New Beginnings tried unsuccessfully to schedule a telephone screening on several different occasions. After multiple attempts to contact the family the case manager was finally able to meet with the parents on May 27, 2015. During the meeting, the case manager called Peninsula and was advised that the mother could be seen the next day due to a cancellation; she did not go. An oral swab obtained from her during that meeting was positive for benzodiazepines, cocaine and marijuana. Respondent's screen was positive for marijuana; he insisted that he was never going to quit smoking marijuana. Based on those drug screens and the parents' failure to cooperate with assessments and services for the previous six months, the Department no longer had any confidence that the parents would successfully comply and cooperate with services; their continuing substance abuse issues placed the children at risk and resulted in the children's removal.

4. The initial permanency plan was developed at a Child & Family Team Meeting on June 25, 2015, Respondent did not appear although he had been invited; the plan was reviewed with him a few days later. Among other things the plan required that he (a) complete a mental health assessment and follow resulting recommendations; (b) complete an alcohol and drug assessment, follow resulting recommendations, and pass random drug screens to demonstrate sobriety; and (c) obtain and maintain safe, suitable housing free from environmental hazards, domestic violence, drug abuse or other risks to the children. He was also expected to visit regularly, to participate in parenting education through therapeutic visitation, to pay child support, and to maintain contact with the children's case manager. The plan was updated periodically but the responsibilities never changed as Respondent made little progress in accomplishing them.

5. After repeated reminders, Respondent finally completed mental health and alcohol and drug assessments on September 8, 2015, through Health Connect America, when the clinician went to Respondent's home to get it done. He reported using cocaine occasionally, with the last use about a month before the assessment, and smoking marijuana every day. He

submitted to a urine drug screen that was clean for all drugs. When confronted with the contradiction between those results and his reported use, he explained that she had taken something from GNC to clear his system. Based on his self-report, the clinician recommended that he "would benefit from co-occurring Intensive Outpatient Program for his PTSD and addiction." He expressed a willingness to participate in treatment.

6. Respondent began intensive outpatient treatment through Health Connect a few weeks after completing his assessments. He missed almost as many sessions as he has attended. He was discharged on February 22, 2016, for non-compliance. Although he did produce two clean drug screens during this time, he was not able to maintain either consistent attendance or consistent sobriety. He never participated in anger management treatment. He reported to the children's case manager that he intended to participate in an anger management group at Health Connect America. On December 2, 2015, he stated that he would be starting such a group the next Friday and would complete the twelve-hour curriculum by attending four 3-hour sessions. He thought he could complete it within a month. His first session was scheduled for the following day. He did not appear. At the end of January 2016 he made the same claim to the children's case manager. He stated that he would complete intensive outpatient treatment and then begin anger management while doing aftercare once each week. When she checked with Health Connect America, she learned that he had not actually spoken with anybody there about starting anger management services and no such plans were in place.

7. Respondent has yet to establish a suitable home for the children. Sometimes he "stays" with his mother. Otherwise, he is with the children's mother in the home of her grandfather, who abuses alcohol. On December 9, 2015, the children's case manager and her supervisor made an unannounced home visit. The grandfather opened the door and insisted that the parents did not live there. He was already intoxicated and appeared agitated and very angry but opened another can of beer during the visit. He claimed the parents had stolen money from him and he wanted them out of the house. While he was explaining this, the children's father came out and told the grandfather that he did not need to be talking to the visitors. Respondent had been asleep when the case manager arrived. When she woke up and came out on the porch, her grandfather said he was going to shoot the children's father. He then went inside the home and shut off the electricity. He returned to the porch and again told the parents to leave; they indicated that they would move out that day and go to the home of Mr. [L.'s] mother. As the children's case manager and her supervisor left the residence, the grandfather pulled away in his truck.

8. Respondent's last urine drug screen, on March 23, 2016, was still positive for marijuana. He has refused to submit to any drug screens since then. He has been encouraged to resume intensive outpatient treatment, to stop smoking marijuana, and to complete his anger management classes. He claims he is too busy at work to do any of this. The Court notes that during this hearing he was not at work or in the courtroom but was somewhere in Lonsdale posting to Facebook.

9. Upon those facts, the Court finds that these children have been removed by order of this Court for a period of six (6) months; the conditions which led to their removal still persist; other conditions persist which in all probability would cause the children to be subjected to further abuse and neglect and which, therefore, prevent the children's return to the care of Respondent; there is little likelihood that these conditions will be remedied at an early date so that these children can be returned to Respondent in the near future; the continuation of the legal parent and child relationship greatly diminishes the children's chances of early integration into a stable and permanent home.

10. The Court further finds that Respondent has failed to comply in a substantial manner with those reasonable responsibilities set out in the permanency plan related to remedying the conditions which necessitate foster care placement. Respondent has done completed nothing other than cooperate with a substance abuse assessment when the clinician showed up at his door. He attended intensive outpatient treatment inconsistently until he was discharged for non-compliance and never quit smoking marijuana. He has done nothing to establish a suitable home for these children. It does not appear that he wants to get clean or to accept responsibility for his children.

11. The Court did not hear proof as to Respondent's ability to support these children and that ground was conceded by counsel.

III

1. Respondent has not made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the children's best interest to be in his home despite reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible. He has not maintained regular visitation or other contact with these children. A change of caretakers and physical environment is likely to have a detrimental effect on the children's emotional and psychological condition. Respondent has shown neglect toward these children. He is without a healthy and safe physical environment to offer the children. He continues to engage in such use of

alcohol or controlled substances as may render Respondent consistently unable to care for the children in a safe and stable manner.

2. The mother's parental rights are terminated on this same date by companion order.

3. The Department of Children's Services has made reasonable efforts toward achieving permanency for these children.

4. The children are entitled to a safe, secure and loving home. They are now placed together in a prospective adoptive home where they are thriving, behaving as typical siblings. They are all meeting their developmental milestones with no therapy needs at this time. They have the opportunity to achieve permanency through adoption. These children deserve to grow up knowing where they will lay their heads at night. They should not have to rely on somebody who is unreliable, to depend on somebody who is undependable.

5. It is, therefore, in the best interest of [the Children] and the public that all of Respondent's parental rights to these children be terminated and the complete custody, control, and full guardianship of the children be awarded to the State of Tennessee, Department of Children's Services, with the right to place them for adoption and to consent to such adoption in loco parentis.

6. Respondent is not hereafter entitled to notice of proceedings for the adoption of these children nor has he any right to object to such adoption or otherwise to participate in such proceedings.

Father timely filed an appeal to this Court.

## Discussion

Although not stated exactly as such, Father raises the following two issues on appeal: 1) whether the Juvenile Court erred in failing to appoint Father counsel for his parental termination proceedings and by failing to make a determination as to whether Father was properly served and notified of trial; and, 2) whether the Juvenile Court erred in finding that it is in the Children's best interest for Father's parental rights to be terminated.

As our Supreme Court recently instructed:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected

by the Due Process Clauses of the federal and state constitutions.[1] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard

---

[1] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[2] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[3] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent

---

[2] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[3] Tenn. Code Ann. § 36-1-113(i).

receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

## B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate

parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered).

We first address whether the Juvenile Court erred in failing to appoint Father counsel for his parental termination proceedings and by allegedly failing to make a determination as to whether Father was properly served and notified of trial. Our Supreme Court recently stated:

Tennessee joined this majority in 2009. Rather than incur the time and expense of litigating the right to appointed counsel in each case under the *Lassiter* balancing test, Tennessee statutorily provides the right to appointed counsel for indigent parents in every parental termination proceeding. Tenn. Code Ann. § 37-1-126(a)(2)(B)(ii) (2014); Tenn. Sup.Ct. R. 13, § 1(c), (d)(2)(B); Tenn. R. Juv. P. 39(e)(2).

*In re: Carrington H.*, 483 S.W.3d at 527-28 (footnotes omitted).

This Court, in addressing the issue of a pro se parent's right to representation in a parental rights termination case, stated:

"Upon finding a party indigent, the court shall enter an order appointing counsel unless the indigent party rejects the offer of appointment of counsel with an understanding of the legal consequences of the rejection." Tenn. S.Ct. R. 13 § 1(e)(3). If the indigent parties refuses to accept the services of appointed counsel, "such refusal shall be in writing and shall be signed by the indigent party in the presence of the court," the trial court shall acknowledgment the fact, and the written refusal of counsel shall be made a part of the record. Tenn. S.Ct. R. 13 § 1(f)(1)-(2).

The record reveals the father filed a *pro se* Answer to the Petition, he appeared at trial to defend the action without counsel, and the transcript of the evidence reveals that his primary defense was his indigency. The

record, however, provides no indication that the trial court made any inquiry regarding the father's indigency or his ability to retain counsel to represent him in the proceedings, wherein his parental rights were subject to being terminated, and the record does not contain a writing to confirm that he knowingly waive the right to appointed counsel.

\*\*\*

Here, the father appeared without counsel at trial to contest the termination petition. Moreover, the father's defense to the claim of abandonment was wholly based on his alleged financial limitations. Each of these facts, standing alone, compelled the trial court to conduct an indigency inquiry and to inform the father of his constitutional right to counsel as mandated by Tenn. S.Ct. R. 13. The record fails to establish that the trial court complied with the mandatory provisions of the rule.

*Lyon v. King*, No. M2007-01156-COA-R3-PT, 2008 WL 490657, at \*\*5-7 (Tenn. Ct. App. Feb. 22, 2008), *no appl. perm. appeal filed* (footnotes omitted).

In the present case, however, Father did not avail himself of his right to representation during the parental rights termination proceedings. In contrast, Father secured counsel both in the dependency and neglect phase and now on appeal. Father knew how to obtain counsel. Father, however, made no appearance before trial after being served in the termination proceeding, did not show up at trial, and finally appeared and requested counsel only after the trial was completed. Father was entitled to representation at trial, if indigent, but he had to take the minimum steps of showing up and proving his indigency at that time. Father did neither.

The evidence in the record on appeal shows that Father knew in advance of the date of trial and that he was served personally. While denying that he was served on March 26, 2016, Father admits that he knew at least by April 27, 2016 that the trial would be on May 3, 2016. Despite this knowledge, Father still did nothing including not showing up at the trial on May 3, 2016. The Juvenile Court made a specific finding that Father was "properly served, that he had actual notice of this hearing and of the consequences of failure to appear, and that he has nevertheless failed to answer, appear, or otherwise defend the petition filed against [him]." The Juvenile Court noted further that "during this hearing [Father] was not at work or in the courtroom but was somewhere in Lonsdale posting to Facebook." The evidence does not preponderate against these or any other findings of the Juvenile Court.

Father argues further that the Juvenile Court should have treated his Notice of Appeal as a Tenn. R. Civ. P. Rule 59 motion to amend judgment or a Rule 60 motion

-13-

for relief from judgment. We review denials of both Rule 59 and Rule 60 motions under an abuse of discretion standard. *Smith v. Haley*, No. E2000-001203-COA-R3-CV, 2001 WL 208515, at *5 (Tenn. Ct. App. March 2, 2001), *no appl. perm. appeal filed*. Rule 59.04, Tenn. R. Civ. P. allows a party to ask the trial court to alter or amend a judgment within 30 days of the entry of the judgment, prior to the judgment becoming final. Similarly, Rule 59.02, Tenn. R. Civ. P. allows a motion for a new trial if made within 30 days of the entry of judgment. After a judgment becomes final, a party may not seek relief under Rule 59, but may seek relief under Rule 60.02. Tenn. R. Civ. P. 60.02 provides that a "court may relieve a party or the party's legal representative from a final judgment, order or proceeding" for any of several specific enumerated reasons, including "mistake, inadvertence, surprise or excusable neglect." Tenn. R. Civ. P. 60.02.

Father submits that the substance of his Notice of Appeal should be prioritized over its form, keeping in mind his pro se status. Father argues the substance of his notice of appeal was really that of a Rule 59 or 60 motion rather than a notice of appeal. This Court has stated:

> Pro se litigants should not be permitted to shift the burden of the litigation to the courts or to their adversaries. They are, however, entitled to at least the same liberality of construction of their pleadings that Tenn. R. Civ. P. 7, 8.05, and 8.06 provide to other litigants. *Irvin v. City of Clarksville*, 767 S.W.2d at 652. Even though the courts cannot create claims or defenses for pro se litigants where none exist, *Rampy v. ICI Acrylics, Inc.*, 898 S.W.2d 196, 198 (Tenn. Ct. App. 1994), they should give effect to the substance, rather than the form or terminology, of a pro se litigant's papers. *Brown v. City of Manchester*, 722 S.W.2d 394, 397 (Tenn. Ct. App. 1986); *Usrey v. Lewis*, 553 S.W.2d 612, 614 (Tenn. Ct. App. 1977).

*Young v. Barrow*, 130 S.W.3d 59, 63 (Tenn. Ct. App. 2003).

Given Father's pro se status, and the fact that he wrote "improper service" on the Notice of Appeal which, in our judgment, arguably suggests a desire for relief from the Juvenile Court's judgment rather than a statement of an issue for appeal, the Juvenile Court could have treated Father's Notice of Appeal as a Rule 59 or Rule 60 motion. We, however, find no reversible error by the Juvenile Court's treatment of the document titled "Notice of Appeal" as just that. In any event, this decision by the Juvenile Court does not impact the ultimate outcome. As already addressed, the Juvenile Court found, as now affirmed by this Court, that Father was properly served and notified of trial and failed to appear. We find no reversible error regarding Father's rights in the

-14-

parental termination proceedings, either as to appointment of counsel or as to service and notice.

Although Father does not raise grounds for termination of parental rights as an issue on appeal, we, as our Supreme Court has said we must, address them nevertheless. Two grounds for termination of parental rights are at issue on appeal. Tenn. Code Ann. § 36-1-113 (g)(2) (Supp. 2016) provides the first relevant ground of substantial noncompliance with the permanency plan as follows: "There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4." Regarding persistent conditions, the termination statute states:

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

Tenn. Code Ann. § 36-1-113(g)(3) (Supp. 2016).

The Juvenile Court made detailed findings, quoted above, regarding grounds for termination against Father. The evidence in the record on appeal does not preponderate against any of these findings by the Juvenile Court. We find and hold, as did the Juvenile Court, that the grounds of persistent conditions and substantial noncompliance with permanency plan are established by the standard of clear and convincing evidence.

The final issue we address is whether the Juvenile Court erred in finding that it is in the Children's best interest for Father's parental rights to be terminated. Father points to his 31 sessions of treatment and that he eventually was discharged only

because of a transportation issue. Father points to evidence in the record describing his participation in drug treatment as "high." Father also states that the foster parents acknowledged a bond between the Children and Father and that DCS's evidence at trial was relatively scant.

The record does show that although Father undertook certain steps toward addressing his substance abuse issues, he never successfully addressed his substance abuse issues. Father refused drug screens and otherwise failed to complete drug treatment. As found by the Juvenile Court, "[Father] continues to engage in such use of alcohol or controlled substances as may render [Father] consistently unable to care for the children in a safe and stable manner." Drug abuse was the basis for the Children's removal from Father in the first place, and Father's failure to address his drug abuse is not a mere detail but the central point in the case. On the other hand, the evidence in the record is that the Children are thriving in foster care. We find and hold, as did the Juvenile Court, that the evidence is clear and convincing that it is in the Children's best interest for Father's parental rights to be terminated. We affirm the judgment of the Juvenile Court.

## Conclusion

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Yaron L., and his surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE