IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 6, 2017 Session

## GAMEEL MESAD v. JOSEPH YOUSEF

**Appeal from the Chancery Court for Davidson County**
**No. 15-202-II      Carol L. McCoy, Chancellor**

_____

### No. M2016-01931-COA-R3-CV

_____

Plaintiff entered into a contract with Defendant for the purchase of a convenience market, whereby Plaintiff purchased the store's inventory and assumed the lease and other contractual obligations of the business. Three years after the sale, Plaintiff filed suit, alleging fraud, unjust enrichment, breach of contract, and violations of the Tennessee Trade Mark act of 2000, all in connection with the sale and operation of the business. Following a trial, the trial court dismissed the suit. Plaintiff appeals; we affirm the judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined.

Ali Abdel Ati, Nashville, Tennessee, for the appellant, Gameel Mesad.

Leroy Johnston Ellis, Old Hickory, Tennessee, for the appellee, Joseph Yousef.

### OPINION

### FACTUAL AND PROCEDURAL HISTORY

In December 2011, Gameel Mesad ("Plaintiff") entered into an agreement to purchase Quick and Easy, a convenience store owned and operated by Joseph Yousef ("Defendant") in Lebanon, Tennessee. At the time they entered into the agreement, the parties signed an inventory list dated December 23, 2011, which contained the following handwritten notations:

- Gamel Mesad pay 30,500
- only thirty thousand five hundred
- to Joseph Yousef he owe to

- Joseph 5,000.00 only five
- Thousand
- Signature [document was signed by Gamel Mesad and Joseph Yousef]

The sheet listed as classes of inventory: grocery, cigarette, tobacco, beer, propane/pipes, miscellaneous, and gas; the "gross total" of the inventory was listed as $39,546.61, and the "net total" was listed as $35,322.69.[1]

At the time the inventory sheet was signed, Plaintiff tendered to Defendant $30,500.00, and a cashier's check for $50,000.00; the next day, Plaintiff gave Defendant an additional $5,000.00. In due course, Plaintiff assumed the lease agreement with Quick and Easy, Inc., the owner of the property on which the store was located, and a ten year contract with Mixon-Nollner Oil Company for gasoline and related pumping and sales equipment, and transferred utilities into his name; Defendant canceled his business license and beer permit, and Plaintiff applied and received a license and permit in his name.

The heart of the dispute in this case relates to the $50,000.00 check that Plaintiff gave Defendant: Plaintiff asserts that the check was only given to Defendant as a deposit on any amounts Defendant would have to pay to the landlord or supplier; Defendant contends that the check was given to him to pay for the purchase of the business. The check, dated October 29, 2011, was payable to Plaintiff, and Defendant deposited the check into his account on December 12, 2011; the parties dispute whether it was endorsed by Plaintiff. The business failed in April of 2013, and Plaintiff filed a proceeding in bankruptcy.

On February 12, 2015, Plaintiff initiated this action to recover $50,000.00, plus interest, on the grounds of fraud, breach of contract, and unjust enrichment, and $17,191.36 "plus any amounts that the defendant might had received from December 2011 through February 2015" on the grounds of fraud and unjust enrichment.[2] In his

---

[1] The "gross total" was the total of the cost of each item of inventory; the record does not show what the "net total" represented.

[2] Specifically, Plaintiff alleged that:

> The defendant's continuous use the commercial name and license of the store that he had for it in the past, fraudulently to purchase cigarettes and other goods from Sam's Club, FAB Wholesales LLC. And other retailers at reduced prices and receiving the refund that those stores pay every month to make profits free of any expenses while the plaintiff paying all the expenses for the store such as rent, labor, taxes etc. making no profits, constitutes fraud and unjust enrichment that entitle the plaintiff to recover any money that the defendant made using the store's Name or license during the period from 12/03/2011 to 04/18/2013 including but not limited to $17,191.36 plus interest on these amounts from the time he received them.

Amended Complaint, Plaintiff added a third count in which he alleged that Defendant had violated the Tennessee Trade Mark Act of 2000, Tennessee Code Annotated section 47-25-501, *et seq.*, and sought treble damages pursuant to section 47-25-514(a). Defendant answered, denying liability and asserting several affirmative defenses. At the conclusion of trial, the court stated its factual findings and conclusions and ruled in favor of Defendant; these finding and conclusions were incorporated into a judgment.

Plaintiff appeals, articulating nine issues; for ease of resolution and in the interest of clarity, we have divided the issues into three areas: (1) the trial court's conduct of the trial and credibility determinations; (2) substantive causes of action asserted by Plaintiff (contract, trademark, and fraud); (3) the court's action in setting aside a default judgment.

## STANDARD OF REVIEW

Review of the trial court's findings of fact is *de novo* upon the record, accompanied by a presumption of correctness, unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Kaplan v. Bugalla*, 188 S.W.3d 632, 635 (Tenn. 2006). Review of the trial court's conclusions of law is *de novo* with no presumption of correctness afforded to the trial court's decision. *See Kaplan*, 188 S.W.3d at 635.

## DISCUSSION

### I. TRIAL DETERMINATIONS

A. Credibility of the parties and witness

Plaintiff contends that the trial court erred in dismissing the case without making an express finding as to his credibility; he argues that, by failing to make such a finding, the trial court "blocked itself from determining the validity of the plaintiff's causes." Plaintiff contends that the court erred in finding Defendant to be credible because "he [Defendant] has not been truthful and changed his story 'under oath' multiple times on every single issue." Plaintiff likewise contends that the court erred in finding a witness, Aboualkasem Mohamed, to be credible "despite his bias, inconsistency, lack of knowledge."

In its oral ruling the court made the following finding as to the credibility of the parties and witness:

> The individual that I found to be most credible was Mr. Mohamed. He is as close to an impartial witness as I could get. I recognize that he is a friend of the Defendant. But in the cross-examination he was asked a number of questions. He testified that he is no longer in a business relationship with Mr. Yousef. He was queried as to what would happen if

Mr. Yousef had to pay the $50,000. He testified that if Mr. Yousef asked him to contribute he would.

That was in the face of [Plaintiff's counsel] asking him whether or not he had terminated the business relationship with Mr. Yousef. He asked him a number of pointed questions to suggest that perhaps their parting was less than friendly. I was impressed with Mr. Yousef's forthrightness - - not Mr. Yousef - - Mr. Mohamed's forthrightness.

I also have to say that I think, whether it's the facility of the language, Mr. Yousef was straightforward in his testimony.

Mr. Mesad was - - because of the language facility required to use a translator, that sometimes impairs the Court's ability to determine credibility, and that is why I turned primarily to the documents to determine the whether or not versions of both gentlemen had credibility.

And I find that the explanation given by Mr. Yousef to be highly credible because of the documents that support it. [3]

Consistent with the foregoing, the Order memorializing the oral ruling stated:

9. The Court finds Mr. Mohamad to be a credible witness.
10. The Court finds the explanation of the facts given by Defendant to be highly credible due to the documents that support his testimony.

As noted in *Kelly v. Kelly*, deference to a trial court's determination of witness credibility is substantial, and our review of those determinations is substantially limited:

When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are uniquely positioned to observe the demeanor and conduct of witnesses. Appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary. In order for evidence to be clear and convincing, it must eliminate any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. Whether the evidence is clear and convincing is a question of law that appellate courts review de novo without a presumption of correctness.

445 S.W.3d 685, 692-93 (Tenn. 2014) (citations omitted).

We first address Plaintiff's contention that the trial court erred by not making an express finding as to his credibility, that by failing to make a credibility finding, the trial

---

[3] In the course of recounting the testimony in the case, the court also stated that it "did not find anything questionable in Mr. Mohamad's testimony and find[] him to be a credible witness."

4

court "blocked itself from determining the validity of the plaintiff's causes," and, therefore, we must "examine the record to make that determination about the credibility of Plaintiff." *Richards v. Liberty Mut. Ins. Co.*, however, held:

> [T]here is no requirement that a trial court make express findings of fact regarding a witness's credibility [and] the absence of such findings does not alter the applicable standard of review. Indeed, the trial court's findings with respect to credibility and the weight of the evidence, as in the present case, generally may be inferred from the manner in which the trial court resolved conflicts in the testimony and decides the case.

70 S.W.3d 729, 733-34 (Tenn. 2002) (citing *Tobitt v. Bridgestone/Firestone, Inc.*, 59 S.W.3d. 57, 62 (Tenn. 2001)). While Plaintiff has cited to testimony that he argues would support a determination that he is credible, the testimony he references merely conflicts with testimony of Defendant or Mr. Mohamed; it is not our function to second guess the lack of a credibility finding by the trial court in this regard.

The trial court found that the language spoken by the parties called for the use of a translator and, in those instances where the language difference presented a challenge to the court's ability to make a credibility finding, the court relied on the documentary evidence to resolve the conflict in testimony and to further inform the court's decision. The court ultimately found that the testimony and documentary evidence presented failed to establish any of Plaintiff's claims. The fact that the court found that the documentary evidence buttressed the testimony of Defendant and Mr. Mohamad, which conflicted with Plaintiff's testimony, supports its credibility determinations.

### B. Impeachment of Defendant

Plaintiff next contends that the trial court erred in two instances by not allowing him to impeach the Defendant by prior inconsistent statements. The first instance occurred in the course of Plaintiff's examination of Defendant regarding a statement Defendant made in an affidavit filed in support of his motion to set aside the default judgment.[4] The testimony cited by Plaintiff shows that Plaintiff was examining the Defendant regarding the statement that he had not received the summons and complaint; there was confusion engendered by the form of the question Defendant was asked, causing his counsel to object, and leading to the following ruling:

---

[4] The court had granted Plaintiff a default judgment, which the Defendant successfully set aside; in granting Defendant relief, the court ruled that "Defendant's delay in answering the complaint was due to mistake, inadvertence, surprise or excusable neglect. There was a genuine dispute between the parties and Defendant did file a response to the motion for default judgment, even though it was late filed." We discuss that ruling later in this opinion.

Q. You want to see it?

[Defendant's counsel]: Your Honor, I'm going to object to the statement - - is it true or false on the date of this affidavit, I think is the more proper question here.

I mean, because he obviously received the summons and complaint now. But on the date of this affidavit had he received the summons and complaint. I think that's the question. I object to the question because it's not specific, and I think it needs to be clarified for the witness.

THE COURT: You'll have an opportunity if this goes much longer to do that on redirect.

But [Plaintiff's counsel], the point that you're trying to make is not being made very well. I see that there is an affidavit by Mr. Yousef in which he says he never received a copy of the summons and complaint. It is dated June 3, 2015.

It also says the only document I received from the sheriff's office was a contact card, a copy of which is attached as Exhibit A. I don't see that.

Then he said I only just recently retained counsel on June 3rd, 2015, the same day that the affidavit was prepared. So I have to presume that his attorney prepared the affidavit because I don't think he prepared it.

\* \* \*

[Plaintiff's counsel]: Did you make the statement Mr. Yousef or not make it?

A. This is my signature. Yes.

Q. This is your statement?

A. Yes.

Q. You're saying you didn't receive it.

I will show you another document.

Q. This is Defendant's response to Plaintiff's Request for Admission of Facts. This is Page 1.

I will go to the very last page, Question number 15 is: "Defendant received a copy of the summons and the complaint of this case March 9, 2015."

The response, "Defendant admit that the summons and complaint were served to his address on or about March 9, 2015, but Defendant denied that he received anything on that date."

This is a contradictory statement.

THE COURT: Let me just say. You're doing okay until you get to that last statement. When you say this is a contradictory statement that is for closing. Right now I'm just interested in the facts.

That also invited arguments by the witness. He doesn't even know to argue. Because you're going to be arguing a legal position.

6

In his brief Plaintiff does not articulate the manner in which he asserts that the court limited his examination of Defendant in this regard. On our examination we fail to discern any error on the part of the court in ruling on the objection or in dialogue with counsel.

The second instance occurred in the course of Plaintiff's examination of Defendant regarding Defendant's 2012 Profit and Loss schedule, which reflected a loss of $15,542. The error of which Plaintiff complains was precipitated by Plaintiff asking Defendant "you said you never filed taxes for Quick & Easy in 2012," to which Defendant replied "Yes"; this was followed by a series of questions to which nonresponsive answers were given. The court periodically interjected in an attempt to assist Plaintiff's counsel and Defendant; Plaintiff contends that the following colloquy encapsulates the trial court's error:

Q. Anything legal your lawyer is responsible for it. Anything with your taxes your accountant is responsible for it.

A. Yes.

Q. What did you know –

A. Absolutely. I give him all the information, and he prepared the tax.

Q. Is that the tax return for 2012 for Quick & Easy or not?

A. Because he's the professional doing that tax. I don't do nothing.

THE COURT: [Plaintiff's counsel] this is carrying a loss forward. He's allowed to do it under the tax laws. If you have a loss you can spread it over a number of years. I have seen it before. And unless you have something on which to challenge the computation that makes some sense to me, he's going to be able to put that in his tax return because of the loss when he had Quick & Easy. There's nothing unusual about it.

[Plaintiff's counsel]: Your Honor, I'm familiar with taxes, and I agree with you there are some loss involved, but not in this form. This form is called Schedule C profit or losses. It's not to carry forward. It shows here Line number -- Line number 4, gross -- it says –

THE COURT: Let me just say, this gentleman just said the taxes were prepared by his attorney -- excuse me -- his CPA. If there's a mistake on it he's not the one that prepared it. He signed it. If the Federal Government comes after him, he may have some liability. But the argument that you're

7

making really needs to be questions to the accountant. Now, if [he] knows why they're there he can answer. If he doesn't, he'll say he doesn't know.

[Plaintiff's counsel]: Your Honor, I have here it says gross profit –

THE COURT: Ask him question.

BY MR. ATI: Q. Can you please read Line number 5?

A. Gross profit, subtract Line 4 from Line 3.

Q. Okay.

A. But it's not – it's not – that's not the gross income.[5]

Plaintiff does not identify any inconsistency between Defendant's testimony and the tax schedule; neither does he articulate the manner in which he asserts that the court limited his examination. Upon our review of the transcript, counsel's examination of Defendant continued, culminating in Defendant's acknowledgement that his accountant had prepared the return and established the $15,542 loss figure. Plaintiff's claim of error is without merit.

C. Conduct of Examination of Witnesses

Plaintiff next complains that the court "erred by allowing the Defendant and Mr. Mohamed to tell their own stories during cross-examination." Plaintiff includes his argument relative to this issue in the portion of his brief discussing the credibility and impeachment issues; he does not separately cite testimony supporting his claim of error in the conduct of the examination of witnesses and does not set forth a cogent argument in this regard. Plaintiff's argument as to these claims fails to comply with Rule 27(a)(6) of Tennessee Rule of Appellate Procedure and Rule 6(b) of the Rules of the Court of Appeals. Failure to make appropriate references to the record and to cite relevant authority in the argument section of the brief constitutes a waiver of the issue. *See Blair*

---

[5] Plaintiff does not cite the remainder of Defendant's answer:

This is -- can you read the Number 4 what it says because he said Number 4 -- Line number 4, not Line 3. I don't know exactly, but that's what I'm understanding from that. That does say, it says goods sold. Sold what? This is not the sales taxes. You understand? This is not the income. This is -- maybe this is my income from gas station. That's information I can ask my CPA about it I don't know what he did exactly. But I give him all the information about Quick & Easy in 2011 and whatever information in 2012, and he prepare all taxes.

8

*v. Badenhope*, 940 S.W.2d 575, 576-77 (Tenn. Ct. App. 1996); *Rampy v. IGI Acrylics, Inc.*, 898 S.W.2d 196, 210 (Tenn. Ct. App. 1994). This argument is waived.

## II. Substantive causes of action

### A. Contractual Issues

Plaintiff contends that the trial court erred in concluding there was an oral contract for the sale of the business. With respect to this contention, in the final order the court found:

> 1. In December 2011, the Plaintiff, Mr. Mesad, and the Defendant, Mr. Yousef entered into a purchase agreement for the Plaintiff to acquire Defendant's convenience store in Lebanon, Tennessee called "Quick and Easy."
>
> 2. The Testimony reflects that Plaintiff had expressed an interest in the store for over a month before reaching an agreement and completing the sale, and that the agreement was for the Plaintiff to pay Fifty thousand dollars, ($50,000.00), plus the value of the inventory, to acquire the store.
>
> 3. The agreement was partially written and partially oral.
>
> 4. The written portion of the agreement was for the purchase of Defendant's inventory in the amount of thirty five thousand five hundred dollars, ($35,500.00).
>
> 5. The Plaintiff paid thirty thousand five hundred dollars in cash to the Defendant on December 3, 2011, and an additional Five thousand dollars, ($5,000.00) by way of a credit card on December 4, 2011.
>
> 6. At the same time Plaintiff made the initial payment for the inventory, Plaintiff gave Defendant a cashier's check in the amount of Fifty thousand dollars, ($50,000.00).[6]

Evidence pertinent to this issue included the testimony of Mr. Mohamed and Defendant. Mr. Mohamed testified that Plaintiff asked him if the Quick and Easy store was for sale; that he and Plaintiff discussed the sale of the store for over a month, during which Plaintiff visited the store multiple times; that when the parties came to an agreement on the terms of the sale of the store and inventory, Plaintiff signed an

---

[6] Citations to the record in the final order are omitted.

inventory agreement and gave Defendant $35,500 for the purchase of the inventory and a $50,000 cashier's check.[7]

Defendant testified that he met with Plaintiff after Mr. Mohammed told him that Plaintiff was interested in purchasing the business; that they agreed that Plaintiff would pay $50,000 for the business plus the price of the inventory; that the parties hired a company to do an audit of the inventory in order to determine its value, and that after the audit was complete, they agreed that Plaintiff would pay $35,500 for the inventory. Mr. Yousef testified further that Plaintiff paid him $30,500 and gave him a $50,000 cashier's check for the purchase price of the business and inventory on December 5, 2011, and the remaining $5,000 the next day; that the check was endorsed by Plaintiff when Plaintiff delivered it to him, but Plaintiff did not endorse it in front of him. Defendant also testified that the lease of the store was transferred to Plaintiff; that Plaintiff took over the oil supply contract with Mixon-Nollner Oil Company and utility payments for the market; and that the business and beer licenses were canceled by the Defendant and new licenses secured by Plaintiff.

The testimony and documentary evidence support the trial court's finding that an oral contract existed for the sale of the business and that the sale was consummated consistent with the terms detailed by Defendant. The testimony cited by Plaintiff in some instances conflicts with that cited by Defendant, but does not preponderate against the finding that there was an oral contract for the sale of the business; accordingly, we affirm the finding. *See* Tenn. R. App. P. 13(d).

Plaintiff also asserts that the oral contract between the parties is unenforceable under Tennessee Code Annotated sections 29-1-101[8] and 47-2-201(1).[9] Neither of these

---

[7] The parties dispute the purpose of the $50,000 check and whether it was signed or endorsed by Plaintiff.

[8] Tennessee Code Annotated section 29-1-101 provides that:

(a) No action shall be brought

> (4) Upon any contract for the sale of lands, tenements, or hereditaments, or the making of any lease thereof for a longer term than one (1) year
> ***
> unless the promise or agreement, upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person lawfully authorized by such party. In a contract for the sale of lands, tenements, or hereditaments, the party to be charged is the party against whom enforcement of the contract is sought.

[9] Tennessee Code Annotated section 47-2-201(1) provides that:

10

statutes, however, is applicable to this case.  With respect to section 29-1-101, the testimony was clear that the transaction did not involve the sale of real property; rather, Plaintiff agreed to lease the building which housed the market.

With respect to Tennessee Code Annotated section 47-2-201(1), in *Hudson v. Town & Ctry. True Value Hardware, Inc.*, our Supreme Court adopted the "predominant asset" test to determine when the Uniform Commercial Code (U.C.C.), codified at Tennessee Code Annotated section 47-1-101, et seq., applied to a transaction involving the sale of goods and non-goods, as defined by the U.C.C.; the court held that "[i]f the predominant assets to be transferred are goods, the U.C.C. [Uniform Commercial Code, codified at Tennessee Code Annotated section 47-1-101, et seq.] governs, but if the predominant assets are non-goods, the U.C.C. has no application." 666 S.W.2d 51, 53 (Tenn. 1984).

The purpose of the transaction in this case was the purchase of the business; as a consequence of the transaction, Plaintiff acquired the predominant assets of the business, including the inventory, rights to rebates from the tobacco suppliers, the rights to do business as "Quick and Easy," and assumed the Defendant's building lease and gas contract.  To the extent the U.C.C. applied to the purchase of the goods which constituted the inventory, the signed inventory agreement satisfied section 47-2-201(1).

In the portion of his brief devoted to the contract issue, Plaintiff claims the trial court erred in admitting the lease between Defendant, Mr. Mohamed, and Quick and Easy, Inc., the owner of the property on which the Quick and Easy convenience store operated.[10]   Defendant offered the lease to show that it included a provision that the profits on the sale of the business would be divided between Quick and Easy, Inc., Defendant, and Mr. Mohamed; Plaintiff objected to its admission on the ground that it was irrelevant, since he was not a party to the lease.  The trial court determined that the

---

> Except as otherwise provided in this section, a contract for sale of goods for the price of five hundred dollars ($500) or more is not enforceable by way of action or defense unless there is some writing or record sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing or record is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing or record.

Tennessee Code Annotated section 47-2-105(1) provides that:

> 'Goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (chapter 8 of this title) and things in action.

[10] Defendant testified that Quick & Easy, Inc. was the owner of the property upon which the market was located and that Samy Said was the owner of Quick & Easy, Inc.

exhibit was relevant "with regards to the figure of $50,000 . . . and why that price was selected" as well as "on the basis that it was represented that the only thing that changed between the lease that Mr. Mesad signed with Mr. Said is the first page. But it appears there are other pages that were also different."

While Plaintiff asserts that the trial court erred in admitting the lease, he fails to make any argument pertaining to how the court abused its discretion or how Plaintiff's substantial rights were affected.[11] Plaintiff's argument as to this issue wholly fails to comply with Rule 27(a)(6) of Tennessee Rule of Appellate Procedure and Rule 6(b) of the Rules of the Court of Appeals. Failure to make appropriate references to the record and to cite relevant authority in the argument section of the brief constitutes a waiver of the issue. *See Rampy v. IGI Acrylics, Inc.*, 898 S.W.2d 196, 210 (Tenn. Ct. App. 1994); *Blair v. Badenhope*, 940 S.W.2d 575, 576-77 (Tenn. Ct. App. 1996). This argument is waived.

B. Fraud

Throughout the proceeding, Plaintiff denied that the signature on the back of the cashier's check was his; he argues on appeal that the trial court erred by failing to find that the signature was a forgery.[12] In the final order, the court concluded that "the proof [wa]s insufficient to demonstrate any forgery of Plaintiff's signature on the cashier's check as alleged in the complaint" and it was "not in a position to do a signature

---

[11] A trial court has a wide degree of latitude in making decisions on the admissibility of evidence, and as previously stated, we will only overturn a trial court's decision upon a showing of abuse of discretion. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 702 (Tenn. Ct. App. 1999). Further, error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected. Tenn. R. Evid. 103; *Brandy Hills Estates, LLC v. Reeves*, 237 S.W.3d 307, 318 (Tenn. Ct. App. 2006).

[12] When it comes to negotiable instruments, e.g., cashier's checks, an "unauthorized signature includes a "forgery as well as a signature made by one exceeding actual or apparent authority." Tenn. Code Ann. 47-3-403, cmt. 1. Since the "Uniform Commercial Code does not define 'forgery,'" "courts look to the definition of the offense in the criminal code. *Bd. of Prof'l Responsibility v. Curry*, 266 S.W.3d 379, 393 (Tenn. 2008). The criminal code defines a forgery as:

[A]ny writing so that it purports to:

(i) Be the act of another who did not authorize that act;
(ii) Have been executed at a time or place or in a numbered sequence other than was in fact the case; or
(iii) Be a copy of an original when no such original existed

Tenn. Code Ann. § 39-14-114(1)(A). Further, a forgery requires that the person who executes the forgery to do so with the "intent to defraud or harm another." *Id.* at -114(a); *see also Curry*, 266 S.W.3d at 393 ("The fact that a signature or endorsement is unauthorized does not necessarily establish it as a forgery unless there is also evidence of an intent to defraud.").

comparison." Plaintiff contends that (1) the trial court should have compared the signature on the check to the signatures on other documents that he testified were authentic and (2) accepted his uncontradicted testimony that he did not sign the check.

In support of his first contention, Plaintiff relies on Tennessee Rule of Evidence 901(b)(3)[13]; his reliance on the rule, however, is misplaced. Rule 901 only sets the requirement that evidence must be authenticated before it may be admitted at trial and illustrates methods by which such evidence may be authenticated. The check in this case was admitted without objection, and the question of whether Plaintiff signed the check was factual, not a question one of admissibility into evidence. Inasmuch as Plaintiff contended that the signature was not his, it was incumbent upon him to introduce evidence sufficient to support his contention. He presented no expert witness or handwriting analysis, and no witness other than Plaintiff testified that the signature was not his.

With respect to his second argument, Plaintiff cites to his own testimony, which he argues was uncontradicted. Other evidence consisted of the testimony of Mr. Mohamed and Defendant. Mr. Mohammed testified that the check was signed when he witnessed Plaintiff deliver it to Defendant:

Q. Okay. Did you see Mr. Mesad sign the check to Mr. Yousef?

A. No.

Q. You didn't see it? You didn't see any signature on the check?

A. No. I saw a signature when he gave Joseph [Yousef] the cashier's check. Joseph looked at it and like --carefully, and he found out everything is good.

For his part, when asked to describe the circumstances surrounding his receipt of the cashier's check from Plaintiff, Defendant testified:

---

[13] Tenn. R. Evid. 901(a)-(b)(3)states:

> (a) General Provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims.
> (b) Illustrations. By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:
> * * *
> (3) *Comparison by Trier of Fact or Expert Witness.* Comparison by trier of fact or by expert witnesses with specimens which have been authenticated.

A. He been give it to me -- that cashier's check. Then he signed on it. He don't sign front me. He then sign on it, and then he gave it to me. I looked at it. We agreed everything, and we wrote it down that -- the other agreement for the inventory. And that's it.

Q. So when you say it had been signed you mean it had been endorsed on the back of the check?

A. Yes.

Q. Was it like that when you received it?

A. Yes.

* * *

Q. Tell me about the appearance of this check when it was delivered to you.

A. He gave it to me. That check had been signed in the back. I don't see him sign it, but it's always been signed on the back with his name.

Q. When you received it?

A. Yes.

As noted earlier, the trial court found that Mr. Mohamed was a highly credible witness; his testimony and that of the Defendant support the finding that the cashier's check was signed when it was delivered to Defendant. *See Richards*, 70 S.W.3d at 733-34. Moreover, no evidence cited by the Plaintiff preponderates against this finding. Accordingly, the trial court did not err in dismissing Plaintiff's fraud claim.

C. Trademark / Tradename Infringement.

Plaintiff alleged that Defendant continued to use the name Quick & Easy after the sale of the business and that this use violated the Tennessee Trademark Act at Tennessee Conde Annotated section 47-25-501, et seq.[14] In its ruling from the bench, the trial court stated the following relative to this claim:

---

[14] With respect to this claim, in the original complaint, Plaintiff alleged:

Despite the defendant sold the store (QUICK & EASY) to the plaintiff, he kept using the name and the license that he had for it in the past, fraudulently to purchase cigarettes and other commodities from Sam's Club, FAB Wholesales LLC, and other

14

I will note right now that it appears that Mr. Mesad entered into an agreement with an entity, a corporation called "Quick & Easy." If there was a trademark violation it would not have been his right to pursue a violation of the Quick & Easy name since it is incorporated; and by virtue of this lease agreement appears to be owned by Samy Said, who executed the lease on behalf of Quick & Easy, Inc.

\*\*\*

But in this instance I do not find that Mr. Yousef continued to use the commercial name of Quick & Easy to purchase cigarettes and to receive refunds. I do not find that Mr. Yousef acted in bad faith so as to violate the Fair Trade Practices Act.

The trial court memorialized its findings in its written order as well:

12. The testimony reflects that the Plaintiff and the Defendant each had separate agreements for tobacco rebates with Philip Morris.

13. The testimony and Exhibits reflect that all tobacco rebates paid to "Quick & Easy" in 2012 were cashed by Plaintiff, including checks for which Defendant was assessed income tax liability, and the proof fails to support any unjust enrichment by the Defendant as alleged in the complaint.

14. The proof fails to demonstrate that the Defendant used the name "Quick & Easy" in any commercial enterprise to purchase cigarettes, obtain refunds, or realize any benefit, after he sold the store to the Plaintiff.

---

retailers to make profits from the monthly refund those stores make to the owner of the store supposedly the plaintiff.

The plaintiff received the form 1099 Misc. from Philip Morris USA with the defendants' name on it, using the store's address, 313 South Cumberland, Lebanon, TN 37087, as his address showing that the defendant received as his profits the amount of $17,191.36 Seventeen Thousand One Hundred Ninety One Dollars and Thirty Six Cents in 2012 only.

The Amended Complaint incorporated those allegations and, in addition, alleged that "the use of the Quick & Easy name after the sale of the business constitutes fraud, unjust enrichment, breach of contract, and infringement under the Tennessee Trademark Act." Our analysis is centered on the Trademark Act.

15. The proof fails to show that the Defendant acted in bad faith so as to violate the Tennessee Trademark Act, or to support any other basis upon which the Plaintiff would be entitled to prevail.[15]

In his brief, Plaintiff asserts that Defendant's 2012 profit and loss statement is "in and by itself enough exclusive evidence that he was infringed upon Plaintiff tradename and used it to make profit free of any expenses." He cites no testimony or other evidence in support of this argument. Once again, Plaintiff's argument fails to comply with Rule 27(a)(6) of Tennessee Rule of Appellate Procedure and Rule 6(b) of the Rules of the Court of Appeals; upon the authority set forth previously, we deem this issue waived.

## III.   ORDER SETTING ASIDE DEFAULT JUDGMENT

On May 19, 2015, Plaintiff moved for a default judgment on the basis that the complaint had been filed on February 12 and served on March 9, yet no responsive pleading had been filed. Defendant responded to the motion on June 3, *inter alia*, advising that he had recently retained counsel and requesting an additional thirty days to respond. His response was accompanied by an affidavit in which he stated that he had never received the summons and complaint; that he had received a contact card from the Sheriff's Office and responded to it; and that he had a meritorious defense; and that he requested thirty days to respond to the complaint. An Order of Default was entered on June 11.

On June 23, Defendant filed a motion to set the default judgment aside in accordance with Tennessee Rules of Civil Procedure 55.02[16] and 60.02[17] reiterating the statements in the affidavit previously filed, and setting forth that the motion for default did not include the notice of hearing required by Local Rule 26.04(g)[18] but, rather, was

---

[15] Citations to the record in the final order are omitted.

[16] Rule 55.02 provides that "[f]or good cause shown the court may set aside a judgment by default in accordance with Rule 60.02."

[17] Rule 60.02 (1) provides that "[o]n motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order or proceeding for the following reasons: (1) mistake, inadvertence, surprise or excusable neglect."

[18] Rule 26.04 of the Local Rules of Practice for the 20th Judicial District states in pertinent part:

    **a.** Motions shall clearly state with particularity the grounds therefore, and shall set forth the relief or order sought as required by Tenn. R. Civ. P. 7.02.
    * * *
    **d.** If the motion is opposed, a written response to the motion must be filed and personally served on all parties. The response shall state with particularity the grounds for opposition to the motion, supported by legal authority, if applicable. If no response is

accompanied by a separate notice setting a hearing for June 5; that his counsel had filed his response to the motion on June 3 and appeared in court on June 5; and that Plaintiff had submitted the Order of Default on June 5. Defendant filed an Answer with his response. Plaintiff filed a memorandum in response to the motion, accompanied by a copy of Defendant's 2012 tax form 1099 received from Philip Morris USA and a list of 34 checks, which Plaintiff represented were "self-certified commercial papers that the defendant had received and deposited into his bank account, including the check number, date and amount." Following a hearing, the court granted the motion, stating:

> Based on the statements and arguments of counsel for the respective parties, the exhibits and memoranda filed in this cause and the record as a whole, the Court finds that the Defendant's delay in answering the complaint was due to mistake, inadvertence, surprise or excusable neglect, as contemplated by Rule 60.02, Tenn. R. Civ. P. The court finds that there is a genuine dispute between the parties, that Defendant did file a response to the Motion for Default Judgment, even though it was late-filed.

Plaintiff argues that the trial court erred in setting aside the default judgment, contending that Defendant's failure to respond was willful and Defendant's alleged "lack of understanding or appreciation of the matter" does not constitute mistake, inadvertence, surprise, or excusable neglect under Tennessee Rule of Civil Procedure Rule 60.02.

In our consideration of this issue we are guided by the following instruction from *Nelson v. Simpson*:

---

filed, the motion shall be granted with the exception of certain proceedings in Probate. (See Rule 39).
**e.** Responses to motions, including counter-affidavits, depositions, briefs or any other matters presented in opposition to motions, must be filed with the clerk's office by the close of business on Monday before the Friday on which the motion is to be heard. The response must also be personally served upon all parties no later than 5:00 p.m. on the Monday before the Friday on which the motion is to be heard. . . .
\* \* \*
**g.** IF NO RESPONSE IS TIMELY FILED AND PERSONALLY SERVED, THE MOTION SHALL BE GRANTED AND COUNSEL OR PRO SE LITIGANT NEED NOT APPEAR IN COURT AT THE TIME AND DATE SCHEDULED FOR THE HEARING.
Counsel or pro se litigant shall then submit the proposed order consistent with Local Rule 33. The order shall recite that no response was timely filed or personally served. See Rule 39 for exceptions to this Rule in certain Probate matters.

From the record it appears that, consistent with Local Rule 26.04, because Defendant's response to the motion was not filed on June 1, the Monday preceding the hearing date of June 5, but was filed on June 3, the motion was not heard but an Order tendered by Plaintiff was entered.

The party seeking to set aside a default judgment has the burden of demonstrating that it is entitled to relief. In order to obtain relief, the party must satisfy the court that it is entitled to relief based on one of the grounds in Tenn. R. Civ. P. 60.02 and that it has a meritorious defense to the plaintiff's suit.

The courts should construe Tenn. R. Civ. P. 60.02's requirements liberally when a party is seeking relief from a default judgment. They should also examine the moving party's proof to determine whether the default was willful and to assess the extent to which the defaulting party's conduct has prejudiced the non-defaulting party.

Like other Tenn. R. Civ. P. 60.02 motions, a motion to set aside a default judgment is addressed to the trial court's discretion. Trial courts should grant relief whenever any reasonable doubt exists concerning whether the default judgment should be set aside.

826 S.W.2d 483, 485–86 (Tenn. Ct. App. 1991) (internal citations omitted). We review the decision to set aside a default judgment under the abuse of discretion standard. *State ex rel. Jones v. Looper*, 86 S.W.3d 189, 193 (Tenn. Ct. App. 2000). An abuse of discretion occurs if a trial court causes an injustice to a party by "(1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010).

Plaintiff argues in his brief that "by setting aside the default judgment on the ground of lack of understanding or appreciation of the seriousness of the documentation, the trial court abused its discretion by applying the incorrect legal standards and reaching an illogical conclusion." We respectfully disagree.

In the affidavit filed in response to the motion for default judgment, Defendant set forth facts intended to show that he was not aware he had been sued until he received the motion for default and that he promptly engaged counsel to advise and represent him; Defendant's answer was filed on the same date as the motion to set aside the judgment. The materials filed by Plaintiff in his response to Defendant's motion and supporting materials did not directly address the grounds for the relief Defendant sought but, rather, addressed the merits of the case. Plaintiff does not argue, and the record does not show, that Defendant misrepresented any fact in his affidavit or that his failure to file a timely answer was willful. Contrary to Plaintiff's argument, lack of understanding or lack of appreciation of the seriousness of the documentation are emblematic of the "mistake, inadvertence, surprise or excusable neglect" contemplated by Rule 60.02(1). Given the liberal construction that trial courts are to apply to motions for relief under Rule 60.02, we do not discern that the trial court abused its discretion in setting aside the default judgment.

18

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____

RICHARD H. DINKINS, JUDGE